Mary **BOWEN**, Individually, as mother and next friend of Mark Bowen, a minor, and on behalf of all similarly situated women

v.

Mary C. **HACKETT**, Director of the Rhode Island Department of Employment Security.

Sharon **FERRI**, Individually, as mother and next friend of Mark Ferri, a minor, and on behalf of all others similarly situated

v.

Mary C. **HACKETT**, Director of the Rhode Island Department of Employment Security.

Civ. A. Nos. 5038 and 5043.

United States District Court,
D. Rhode Island.
Jan. 16, 1975.

Gold v. Secretary of Health, Education and Welfare, 463 F.2d 38, 41 (2d Cir. 1972).

John M. Roney, and Kenneth F. Mac-Iver, R. I. Legal Services, Inc., Providence, R. I., for plaintiffs.

W. Slater Allen, Jr., Asst. Atty. Gen. (R. I.), Louis Baruch Rubinstein, and Charles H. McLaughlin, Providence, R. I., for Dept. of Employment Security.

## OPINION

PETTINE, Chief Judge.

The plaintiffs, in these consolidated actions, on behalf of themselves, and others similarly situated, filed suit challenging those sections of the Rhode Island Unemployment Insurance Act and Temporary Disability Insurance Act, (hereinafter "TDI") and the administrative procedures thereunder which routinely provided for children's dependency benefits to unemployed males while requiring females to prove dependency to the satisfaction of the Director. During the pendency of this litigation, the statutes in question were amended by the legislature to remove the challenged clauses and the case was remanded to a single judge for determination with regard to declaratory judgment and entitlement to retroactive payments.

On July 13, 1973, this Court ruled that the prior statute and procedures of the defendant had been unconstitutional, stating that "[t]he clause 'provided, however, where the individual making the claim is a woman, the dependency status of such children shall be established to the satisfaction of the director' contained in both R.I.G.L. § 28–44–6(C) and § 28–41–5(C) violates the equal protection clause of the Fourteenth Amendment to the United States Constitution." 361 F.Supp. 854, 862 (D.R.I.1973). The question of back payments was reserved pending the outcome of Edelman v. Jordan, 41 U.S.L.W. 3602 (U.S. 1973).

On March 25, 1974, the Supreme Court held that an award of retroactive benefits to recipients of the Illinois Aid to the Aged, Blind and Disabled (AABD) program was barred under the Eleventh Amendment to the United States Constitution. Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In light of that decision, this Court requested parties for both sides to submit briefs on the question of whether retroactive payments in this case were barred under the principle of Edelman v. Jordan.

The two broad issues now before the Court with regard to retroactive payments are:

1) does the Eleventh Amendment bar such an award as against the State, and;

2) even if the Eleventh Amendment does not bar such an award, are retroactive payments justified in this case on a "balancing of the equities". *See* Rothstein v. Wyman, 467 F.2d 226, 234 (2d Cir. 1972); Jordan v. Weaver, 472 F.2d 985, 993 n. 14 (7th Cir. 1973), rev'd on other grds. sub. nom., Edelman v. Jordan, *supra*.[1]

---

1. "Re: Bowen v. Hackett—C.A.No. 5038
   Ferri v. Hackett—C.A.No. 5043

Gentlemen:

The Court is in receipt of the briefs regarding the question of retroactive payments in light of Edelman v. Jordan [415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed. 2d 662], 42 U.S.L.W. 4419 (U.S. March 25, 1974). In those briefs, the statutory basis of the temporary disability and unemployment security funds in relation to the Eleventh Amendment is discussed extensively. However, in review of the record in the case, the court is concerned that it does not have before it a sufficient evidentiary basis presented with adequate clarity to determine:

1) whether there are actually monies in the T.D.I. and unemployment insurance fund currently available to pay back benefits if such are ordered;

2) the practical difficulties of a retroactive order herein in relation to:
   a) How potential recipients of retroactive payments will be identified and notified and the limits of the class as certified by this court;
   b) the number of potential recipients of retroactive benefits and the dollar estimate of such benefits;
   c) how the amount of retroactive entitlement would be calculated under such an order;
   d) what effect, if any, an order of retroactive benefits will have on the funds in question (including costs of administration involved in retroactive payments) in relation to monies available to meet the continuing obligations of the programs (even assuming no funds from the general treasury will be expended and the state has no liability to the fund over the amount of contributions. Of course, such an assumption is essential to plaintiffs' 'trust fund' theory).

3) Apart from the Eleventh Amendment, and related to #2 above, whether an award of retroactive benefits is justified on a 'balancing of equities.' Rothstein v. Wyman, 467 F.2d 226, 234 (2d Cir. 1972); Jordan v. Weaver, 472 F.2d 985, 993 n. 14 (7th Cir. 1973), rev'd on other grds. sub. nom.; Edelman v. Jordan, *supra*;

4) the extent of federal financial involvement in the programs in question and the effect of such involvement, if any, on the relief requested.

Subsequent to this Court's declaratory judgment of July 13, 1973, plaintiffs propounded a series of fifty-four interrogatories which were answered by the defendant. While these questions were obviously designed to meet the evidentiary void on this issue, I am not convinced that the resultant answers clear up the lingering difficulties I have outlined above. In addition, it is apparent that there is some disagreement regarding the availability of monies for retroactive payment and the impact on the funds in question.

Therefore, this matter will be set down for an evidentiary hearing and oral argument on July 26, 1974 as second ready. The issues I have outlined herein should be addressed with particularity.

Sincerely yours,

RAYMOND J. PETTINE
Chief Judge

RJP/vg"

## ELEVENTH AMENDMENT

Plaintiffs seek back payments for themselves and other members of the plaintiff class who were denied dependents' benefits under the unemployment insurance and/or the T.D.I. programs by virtue of the provisions declared to be unconstitutional, and allege the retroactive benefit period to commence in November, 1971 (one year prior to the commencement of this suit)[2] to and including May 11, 1973 (the effective date of the corrective statutory amendments). It is plaintiffs' contention that "but for" the enforcement of the unconstitutional provisions, the women in question would have been entitled to dependent's benefits under either or both programs, and to deny such retroactive payments would bar any effective relief for the plaintiff class.[3]

In *Edelman,* the district court found that Illinois had administered its AABD program in a manner inconsistent with federal law, awarded prospective injunctive relief and, in addition, ordered State officials to "release and remit AABD benefits wrongfully withheld to all applicants for AABD in the State of Illinois who applied between July 1, 1968 [the date of the federal regulations] and April 16, 197[1] [the date of the preliminary injunction issued by the District Court] and were found eligible . . . ." The Court of Appeals for the Seventh Circuit affirmed. See 472 F.2d 985. The Supreme Court, however, reversed the award as it pertained to retroactive payments on the ground that such benefits were barred by the Eleventh Amendment.[4] Mr. Justice Rehnquist, writing for the majority, traced the history of the Eleventh Amendment, and recognized that a rule has evolved.

" . . . that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." 415 U.S. at 663, 94 S.Ct. at 1356.

*See* Ford Motor Company v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). *See also* Kennecott Copper Corp. v. State Tax Commission, 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); Great Northern Life Insurance Co. v. Read, 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944).

The Court refused to categorize the back payments in question as mere "equitable restitution", as opposed to damages, and thus did not accept respon-

2. Plaintiffs assert that the appropriate benefit period should commence one year prior to the commencement of this law suit on the basis that under both programs the director may reconsider a denial of eligibility at any time within one year from the date of such a determination. See R.I.G.L. §§ 28–44–39, 28–41–16.

3. Plaintiffs' argument is as follows:
"If benefits are not awarded to them, the plaintiffs and their class are in the classic posture of one who has won the battle but lost the war. Unlike welfare policy changes, any other remedy does not help the plaintiffs. Their eligibility for unemployment insurance or temporary disability insurance benefits has long since expired. These funds, unlike welfare, impose time restrictions upon eligibility and once a benefit year has ended there exists no further right to benefits. Welfare policy changes, on the other hand, benefit most of the class originally filing the lawsuit because their continuing eligibility rests not on time but on financial considerations and it can be presumed that most of a class of welfare recipients will continue to be eligible for benefits. *All* of the class in this case have exhausted their benefit years and thus any policy changes affect an entirely different group of people." Plaintiffs' Pre-Trial Brief at 2.
However, the fact that *all* members of the plaintiff class are no longer eligible for benefits under either program may be an equitable factor weighing in defendant's favor. *See infra.*

4. "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state."
By judicial interpretation, the Amendment has been held to bar suits against an unconsenting State brought in federal court by her own citizens as well as by citizens of another State. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

dent's argument that such payments fall within the exception to the Eleventh Amendment bar on federal suits against a state as was created in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L. Ed. 714 (1908). The *Young* exception was narrowed to questions of prospective injunctive relief, and the Court found that,

> "The funds to satisfy the award in this case must inevitably come from the general revenues of the State of Illinois, and thus the award resembles far more closely the monetary award against the State itself, Ford Motor Co. v. Department of Treasury, *supra*, than it does the prospective injunctive relief award in Ex parte Young." 415 U.S. at 665, 94 S.Ct. at 1357.

The plaintiffs argue, however, that the *Edelman* decision is not controlling

in the instant case, in that the unemployment insurance and T.D.I. programs do not involve general statute revenues, but merely contributions from employers and employees and earnings made from investment of such contributions, for which funds the state is custodian, R.I. G.L. §§ 28–42–18, 28–39–4, 28–39–7;[5] that the programs are independently administered by State officials in a trustee capacity, and that withdrawals are to be made solely to pay benefits and costs of administration, R.I.G.L. §§ 28–39–5, 28–39–6 and 28–42–19, 28–42–20; that the State itself has insulated itself from financial liability for benefit payments pursuant to R.I.G.L. §§ 28–39–4, 28–39–7 and 28–42–18 *see* note 5 *supra*; and that the State has no legal obligation to supplement the funds if they become depleted, R.I.G.L. §§ 28–39–11, 28–42–33.[6]

---

5. "28–42–18. Employment security fund established—Sources.—

There is hereby created the employment security fund, to be administered by the director without liability on the part of the state beyond the amounts paid into and earned by the fund. This fund shall consist of all contributions, of interest and penalties paid pursuant to §§ 28–42–62 to 28–42–70, inclusive, and §§ 28–43–15 to 28–43–23, inclusive, and of all other moneys paid into and received by the fund, or property and securities acquired by and through the use of moneys belonging to the fund, and of interest earned upon the moneys belonging to the fund, and all money credited to this state's account in the unemployment trust fund pursuant to § 903 of the social security act, as amended. All moneys in the fund shall be mingled and undivided."

"28–39–4. Temporary disability insurance fund created—Sources.—

There is hereby created the Rhode Island temporary disability insurance fund, to be administered by the director, without liability on the part of the state beyond the amounts paid into and earned by the fund. This fund shall consist of all payments made subsequent to June 30, 1947, in accordance with the provisions of § 28–39–29 and of all payments of interest, and of all moneys requisitioned from the unemployment trust fund and deposited into this fund, and of all moneys which may be allocated to said fund from the temporary disability insurance reserve fund, as well as all property and securities acquired by

and through the use of moneys belonging to the fund, and of interest earned upon the moneys belonging to the fund. All moneys in the fund shall be mingled and undivided."

"28–39–7. Reserve fund created—Sources.—

There is hereby created the temporary disability insurance reserve fund, to be administered in the manner hereinafter prescribed without liability on the part of the state beyond the amounts paid into and earned by said reserve fund. This reserve fund shall consist of all contributions, of all penalties paid subsequent to June 30, 1947, pursuant to §§ 28–39–23 to 28–39–32, inclusive, and §§ 28–40–1 to 28–40–8, inclusive, and of all other moneys paid into and received by said reserve fund, of property and securities acquired by and through the use of moneys belonging to said reserve fund, and of interest earned upon the moneys belonging to said reserve fund. All moneys in said reserve fund shall be mingled and undivided."

6. "28–39–11. Recommendations to protect fund—Emergency modification of rules.—

Whenever the director believes that a change in contribution and/or benefit rates shall become necessary to protect the solvency of the fund, he shall at once inform the governor and the general assembly thereof and make recommendations accordingly.

In such case the governor may declare an emergency and authorize the director to announce a modified scale of benefits, an

In addition, with respect to the unemployment insurance program, plaintiffs cite R.I.G.L. § 28–42–71 which provides that upon termination of the program, the monies in the fund shall be refunded ratably, without interest, to the individual employer and employee contributors, without such monies reverting to the State for its general purposes. Thus, according to plaintiffs, any judgment awarding retroactive benefits will be paid out of the two special funds in question without further action by the state legislature, thus shielding the general revenues of the state from liability. Since these two funds are comprised wholly of the contributions of participants paid directly to the fund, (and money earned thereon) without any intermediate legislative appropriation and the state having statutorily insulated from any liabilities incurred by these programs, it is argued that *Edelman* is readily distinguishable. Plaintiffs rely primarily on case law dealing with the "alter ego" theory under the Eleventh Amendment, apparently resting on the reasoning that these funds are self-sus-

taining and financially independent of the state and, therefore, are not entitled to the sovereign immunity enjoyed by the State itself.[7]

Defendant, on the other hand, argues that the Department of Employment Security, charged with the administration of both programs, is a duly constituted component of state government, R.I.G.L. § 42–19–1; that the General Treasurer of the State is charged with statutory responsibility as custodian of the funds, R.I.G.L. §§ 28–42–20, 28–39–6; and that the General Treasurer must give a bond conditioned on the faithful performance of his duties as custodian of the funds, which bond is paid from funds made available by the General Assembly, R.I. G.L. §§ 28–42–27, 28–39–9. Although not entirely clear from the briefs submitted, it appeared from the testimony at the hearing that the costs of administration for the unemployment insurance program are financed by the federal government, whereas the costs of administration of the T.D.I. program are from the fund itself.[8] Defendant's argument

---

increased waiting period, or other changes in rules and regulations regarding eligibility for payment of benefits which the director may deem necessary to assure the solvency of the fund; such modified regulation to be in effect until the governor declares the emergency at an end, or until further action is taken by the general assembly." (T.D.I.).

"28–42–33. Modifications to protect fund.— Whenever the director believes that a change in contribution and/or benefit rates will become necessary to protect the solvency of the fund, he shall at once inform the governor and the general assembly thereof and make recommendations accordingly. In such case the governor may declare an emergency and authorize the director to announce a modified scale of benefits, an increased waiting period, or other changes in rules and regulations regarding eligibility for payment of benefits which the director may deem necessary to assure the solvency of the fund; such modified regulations are to be in effect until the governor declares the emergency at an end, or until further action is taken by the general assembly." (unemployment insurance).

7. Aerojet-General Corporation v. Askew, 453 F.2d 819 (5th Cir. 1971); Matherson v.

Long Island State Park Commission, 442 F. 2d 566 (2d Cir. 1971); Urbano v. Board of Managers of New Jersey State Prison, 415 F.2d 247 (3rd Cir. 1969), cert. denied, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970); S. J. Groves & Sons Co. v. New Jersey Turnpike Authority, 268 F.Supp. 568 (D.N.J.1967); Krisel v. Duran, 258 F.Supp. 845 (S.D.N.Y.1966), aff'd, 386 F.2d 179 (2d Cir. 1967), cert. denied, 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968); Zeidner v. Wulforst, 197 F.Supp. 23 (E.D.N.Y.1961).

8. Defendant claims that administrative expenses for the T.D.I. program, since 1956, have constituted part of the appropriations made by the General Assembly each year. The fact remains, however, that this "appropriation" is payable out of the Temporary Disability Insurance Reserve Fund, which is comprised solely of contributions and penalties paid by employers and employees, and monies earned thereon "without liability on the part of the state beyond the amounts paid into and earned by said reserve fund". R.I.G.L. § 28–39–7. Thus, while technically referred to as an "appropriation", the administrative expenses of the T.D.I. program are from the fund itself, and not from the general treasury of the state.

is best illustrated by a statement from her brief:

". . . a state legislature in the exercise of its constitutional prerogatives and as the legislative body of a sovereign state has every authority to establish public funds whether they are derived from taxation, from other revenues, from penalties or fines, or from any other source. The fact that in certain instances it believes that the best method of obtaining the goals which it has set for any of its programs or projects is the establishment of special funds which are to be utilized precisely for the purposes set by the Legislature, does not constitute them as other than public monies." Defendant's Memorandum at 14.

Defendant does not dispute the fact that under Rhode Island law all revenue held by the State is either credited to the "general fund" or to one of the "special funds" enumerated in R.I.G.L. § 35–4–1, and that the funds in question here are clearly monies in a special fund. See also R.I.G.L. §§ 35–4–2, 35–3–14. In fact, defendant concedes that the funds in question are independent and not available for general revenue purposes. (Defendant's Memorandum at 28). However, defendant argues:

". . . it is apparent that while the 'general fund' is utilized for general expenses of the state, it by no means constitutes a narrow limited 'state treasury' to the exclusion of all special funds created by law and sub-

ject to the custody and supervision, in accordance with specific provisions, of the General Treasurer, who is a constitutional officer." Defendant's memorandum at 18.

Defendant supports her argument that these funds constitute the general revenue and public funds of the state, and thus are immune from federal judgment, by citing the Court to Dowe v. Egan, 133 Conn. 112, 48 A.2d 735 (1946), and New Jersey Sports and Exposition Authority v. McCrane, 61 N.J. 1, 292 A.2d 545 (1972). In *Dowe*, the legal status of Connecticut's unemployment compensation fund was considered, and found to constitute "public money" as those words are used in the state constitution with regard to the question of authority for disbursement and custody of the funds in that state.[9] In *McCrane*, the New Jersey Supreme Court found that the legislative creation of a financially self-sustaining sports authority did not contravene various provisions of the state constitution, and was thus a properly constituted government instrumentality.

While neither *Dowe* or *McCrane* dealt with questions of sovereign immunity under the Eleventh Amendment, defendant asserts that these cases support the contention that special funds do not lose their character as public monies for Eleventh Amendment purposes merely because they are designated to be used for a specific governmental purpose.

---

As to the unemployment insurance program, defendant claims that costs of administration are paid from the Employment Security Administration Account, R.I.G.L. § 28–42–26, which consists of:

". . . all moneys that may be appropriated from time to time by the general assembly, or received by the secretary of labor of the United States, or the railroad retirement board, or other agency, for the administration of said chapters." R.I.G.L. § 28–42–25.

This provision is somewhat misleading, however, since it became clear to the Court at the hearing that, as presently constituted, the entire cost of administration of the unemployment insurance program is from

funds appropriated to the State from the federal government. *See* R.I.G.L. §§ 28–42–28, 28–42–29.

9. "Money in the treasury of the state may be none the less 'public money' because it consists of a special fund which can be used only for a particular purpose . . . . Without attempting an all-inclusive definition of the words 'public money' as used in our [state] constitution, they certainly include money raised by the state by compulsory process in order to carry out one of its governmental purposes and deposited in the state treasury until properly disbursed . . . . " 48 A.2d at 738.

Thus, it is defendant's position that:

1. The Employment Security Fund and the Temporary Disability Insurance Fund are public funds and constitute a part of the state treasury of Rhode Island;

2. The State of Rhode Island has not waived its sovereignty in the matters at issue;

3. The decision of the United States Supreme Court in *Edelman* is completely applicable hereto, and;

4. The cases should, therefore, be dismissed in relation to any award of retroactive benefits.

■ While for various purposes, and in different contexts, the funds in question might be considered "public monies", *see* Dowe v. Egan, *supra*, this Court must look only to the narrower inquiry as to whether a judgment having a direct impact on these funds constitutes a suit against the state, i. e., to be paid "from public funds in the state treasury", in the context of the Eleventh Amendment. This narrower question is one of federal law and, while state law may be of some guidance on this issue, it is not determinative. *See* Ford Motor Co. v. Department of Treasury of State of Indiana, *supra*; Pennsylvania Turnpike Commission v. Welsh, 188 F.2d 447 (3rd Cir. 1951); S. J. Groves & Sons Co. v. N. J. Turnpike Authority, 268 F. Supp. 568, 571 (D.N.J.1967); Zeidner v. Wulforst, 197 F.Supp. 23 (E.D.N.Y. 1961). The mere fact that a particular agency or instrumentality was created by the state legislature and performs certain governmental functions is not dispositive of this issue. *See* Gordenstein v. University of Delaware, 381 F. Supp. 718, 723 (D.Del.1974); Raymond International, Inc. v. M/T Dalzelleagle, 336 F.Supp. 679, 682 (S.D.N.Y.1971); Lowes v. Pennsylvania Turnpike Com-

mission, 125 F.Supp. 681 (M.D.Pa. 1954).[10]

■ There has developed a clear line of judicial authority which has held that if the legislature has intentionally insulated the treasury of the state from any liabilities that a particular financially self-sustaining instrumentality might incur, that instrumentality does not constitute the "alter ego" of the State, and suit against such a body or its officers is not barred by the Eleventh Amendment. *See* Matherson v. Long Island State Park Commission, 442 F.2d 566 (2d Cir. 1971); Urbano v. Board of Managers of New Jersey State Prison; 415 F.2d 247 (3rd Cir. 1969), cert. denied, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970); Harrison Construction Co. v. Ohio Turnpike Commission, 272 F.2d 337 (6th Cir. 1959); Gordenstein v. University of Delaware, *supra*; Raymond International, Inc. v. M/T Dalzelleagle, *supra*; S. J. Groves & Sons Co. v. New Jersey Turnpike Authority, *supra*; Zeidner v. Wulforst, *supra*; Lowes v. Pennsylvania Turnpike Commission, *supra*. By analogy, these cases are persuasive authority that the funds in question herein are not "public funds in the state treasury" for Eleventh Amendment purposes. These funds, as they pertain to moneys available for dependents benefits under both programs, are not the product of legislative appropriation but represent revenues collected from a limited class of persons through an administrative process, and segregated from the general revenues of the state. The legislature having specifically protected the State's general revenues from liability, R.I.G.L. §§ 28–39–4, 28–39–7 and 28–42–18, *see* note 5 *supra*, the faith and credit of the State of Rhode Island have not been pledged in relation to benefit payments under either program. *See* Lowes v. Pennsylvania Turnpike Commission, *su-*

10. "A political subdivision or a corporation may be created by and with such powers as are given to it by the State and there may be included therein service of a governmental character, delegated to it to be performed on behalf of the sovereign state without entitling it to such [Eleventh Amendment] immunity." Lowes v. Pennsylvania Turnpike Commission, *supra* 125 F.Supp. at 683.

*pra*; S. J. Groves & Sons Co. v. New Jersey Turnpike Authority, *supra*. Certainly, the legislature has put in motion an administrative apparatus to collect employer and employee contributions and to invest such monies to sustain the operation of these programs, as well as having provided statutory guidelines for the payment of such benefits. Yet this alone is not determinative of the Eleventh Amendment question. The fact that the General Assembly may feel *morally* obligated to replenish the funds in time of emergency is of no consequence. Such a possible ancillary effect on the state's general treasury is simply too attenuated to bring the Eleventh Amendment into play. Gordenstein v. University of Delaware, *supra*, 381 F. Supp. at 721. *See* Note, The Applicability of Sovereign Immunity to Independent Public Authorities, 74 Harv.L.Rev. 714, 722 (1961). Under R.I.G.L. §§ 28–39–11 and 28–42–33, *see* note 6 *supra*, there is no *legal* duty to pledge the general revenue of the state for the operation of these programs. The absence of such a legal duty is apparent from R.I.G.L. §§ 28–39–4, 28–39–7 and 28–42–18. *See* note 5 *supra*.

■ ■ Furthermore, the fact that the General Treasurer is custodian of these funds, R.I.G.L. §§ 28–42–20, 28–39–6 does not require a finding that they are "public funds in the state treasury", when the state itself has washed its hands of financial responsibility for benefits to be paid under the programs.[11]

■ Several of the aforementioned cases have enumerated a variety of factors to be considered by a Court in determining if a particular agency or instrumentality is the "alter ego" of the state for Eleventh Amendment purposes.[12] While no one of these factors is conclusive, the most important is whether payment of a judgment will have to be made out of the state treasury, i. e., whether the fund in question has both the independent power and resources to pay the judgment without further action by the state legislature or other governmental officer or entity. Gordenstein v. University of Delaware, *supra*; Krisel v. Duran, *supra*. These cases have also found significant the fact that a state legislature has "carefully immunized the treasury of the State from any obligations whatever" arising out of a particular program. Harrison Construction Co. v. Ohio Turnpike Commission, *supra*, 272 F.2d at 339; S. J. Groves & Sons Co. v. New Jersey Turnpike Authority, *supra*. In

---

11. The mere fact that the General Assembly allocates funds to finance the bond of the General Treasurer to insure faithful performance of his custodial duties, R.I.G.L. §§ 28–42–27, 28–39–9, cannot be considered a pledge of the general revenue of the state to meet benefit payments under either program. The liability which such bond protects against is *not* liability to claimants for benefit payments, but simply for mismanagement of the fund itself. Again, such minimal state financial involvement is simply too far removed to have any significance for Eleventh Amendment purposes.

12. ". . . [L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance.

Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations." Krisel v. Duran, 258 F.Supp. 845, 849 (S.D.N.Y.1966), aff'd per curiam, 386 F.2d 179 (2d Cir. 1967), cert. denied, 390 U.S. 1042, 88 S.Ct. 1635, 20 L. Ed.2d 303 (1968) (footnotes omitted). *See* Urbano v. Board of Managers of New Jersey State Prison, *supra*; Gordenstein v. The University of Delaware, *supra*.

Raymond International Inc. v. M/T Dalzelleagle, *supra*, the Court noted in relation to New York's Triborough Bridge and Tunnel Authority:

> "Whether Triborough is entirely separate and distinct from the state for every purpose need not be determined. What is crucial is whether the relief sought is, in effect, relief against the state." 336 F.Supp. at 681.

I find that both the unemployment insurance and T.D.I. funds carry with them these indicia of independence from the sovereign, and thus it cannot be claimed by the defendant that she is entitled to share in the state's Eleventh Amendment immunities in relation to the relief requested herein by plaintiffs.[13]

While defendant is correct in her contention that the mere separation of a special fund from the general treasury does not necessarily negate the Eleventh Amendment bar, the more important issue is not separateness *alone*, but that the State has gone further and immunized its general revenues from financial liability.[14]

The funds in question are not a product of general taxation, but are created from revenues collected from a particular group, namely employees and employers, for whom the benefits of these programs accrue. While this fact alone is not of crucial significance, it has been noted that the immunity doctrine is least justified in those situations in which the burden of liability falls less upon the general taxpayer and more upon the users of a particular program or facility.[15]

13. No evidence is before me that would provide answers to *all* the factors deemed relevant in *Krisel* and *Urbano*. *See* note 12 *supra*. I do find, however, that a judgment of retroactive benefits would be satisfied from separate funds which are independent from the state's general revenues, and that the state has specifically immunized itself from responsibility for benefit payments. I find these two factors to be of overriding significance in this case.

14. In Ford Motor Co. v. Department of Treasury, *supra*, and in Kennecott Copper Corp. v. State Tax Commission, *supra*, taxes were paid under protest by taxpayers who alleged that a particular state tax assessment was in violation of the United States Constitution. In *Kennecott* the moneys paid under protest were deposited in a special segregated account. In both instances, taxpayer suits in federal court were held to be barred by the Eleventh Amendment. However, both cases are distinguishable from the instant facts. First of all, there was a strong presumption that there was no consent by the state to be sued in other than its own courts regarding matters of state taxation, due to the direct impact of such litigation upon the state's finances. Secondly, even in *Kennecott*, where the allegedly illegal exaction was segregated from the state's general funds, the Court noted that plaintiff was seeking *more* than a refund, but was also seeking interest and costs which would have to be paid out of the general treasury.

To the contrary, the litigation here deals with programs which are not intimately tied to the state's general taxing power, and plaintiffs are simply seeking back payments which would be paid solely from the funds in question, without effect on the general revenues of the State of Rhode Island.

*See also* State of Louisiana v. Jumel, 107 U. S. 711, 2 S.Ct. 128, 27 L.Ed. 448 (1883), in which the Supreme Court rejected the "trust fund" concept in relation to a suit involving the revenue from bonds issued by the state, in that the officers in whose custody the particular moneys were placed were under no obligation to keep the funds separate from other revenue in the general treasury, nor to use the moneys solely to pay the bondholders, who were plaintiffs in that action. 107 U.S. at 726, 2 S.Ct. at 140. In the instant case, the funds are earmarked for a particular and exclusive purpose and are not mingled with the general state revenues.

15. ". . . there is a discernible and justifiable trend toward eliminating the immunity when the burden of liability falls less upon the general taxpayer and more upon the users of a particular facility. Independent authorities seem to fall at the end of the spectrum where immunity is least justifiable. A judgment rendered against an authority would not be payable out of the general funds of the state treasury raised by taxation: Often an authority's enabling statute explicitly provides that the state treasury shall not be liable for

■ Regarding the cost of administering these programs, it appears at the present time that as to the unemployment insurance program, costs of administration are borne entirely by the federal government, whereas for the T.D.I. program, administrative costs are from the fund itself. *See* note 8 *supra*. This fact further accentuates the lack of direct financial involvement by the State in these programs, and lends added weight to the analogy that these programs do not constitute the "alter ego" of the State for Eleventh Amendment purposes.

Based on the foregoing analysis, I find that the Eleventh Amendment does not constitute a bar to the type of relief requested by plaintiffs herein, to wit, payment of retroactive benefits for dependents allowances under the unemployment insurance and T.D.I. programs.

### Balance of the Equities

Notwithstanding the finding that the Eleventh Amendment does not bar the relief requested herein, this Court must consider whether such retroactive payments are justified in equity. *See* note 1 *supra*. In particular, this Court is interested in weighing with some degree of precision the costs of administering retroactive benefits to the plaintiff class with the amount of benefits to be conferred, and in considering the precise impact of such an award on the ability of the Department of Employment Security and the funds in question to meet the ongoing demands of those presently in need.[16]

Judge McGowan indicated the impact of such equitable considerations in rela-

tion to an award of retroactive benefits as a form of relief in welfare litigation:

". . . we cannot be sure that the persons from whom funds were withheld in 1969 have a present compelling need for them, or that it is provident, given existing deprivations which might be relieved, to order the expenditure of scarce funds as compensation for past suffering which, however deplorable, cannot be undone.

. . .

As time goes by, retroactive payments become compensatory rather than remedial; the coincidence between previously ascertained and existing needs becomes less clear." Rothstein v. Wyman, *supra*, 467 F.2d at 234–235.

■ On the other hand, this Court cannot ignore the basic unfairness that is engendered if a state may follow an unconstitutional procedure over a number of years, thus illegally withholding payments to some persons otherwise eligible, and do so with impunity until ordered by a court to discontinue its unconstitutional actions. Some administrative inconvenience is inevitable in such relief, and this Court must examine closely the true extent of such burden before it could rule in defendant's favor. The mere conclusory statement by defendant that the administrative burdens of paying retroactive benefits far outweigh the value of such benefits to the plaintiff class, or that the disruption that would be occasioned by such a judgment would hinder the Department's ability to meet its obligations to currently eligible recipients, cannot serve as a substitute to evidentiary facts which would help the court make the requisite

---

any of the authority's obligations; even in the absence of such an express provision, it would seem proper to infer the same result since the authority has revenues of its own from tolls, rents, and other charges which it has power to adjust so as to meet its operating expenses." Note, 74 Harv.L.Rev. 714 at 720–21 (1961) (footnotes omitted).

I find the analogy between independent authorities and the funds here under consideration to be compelling.

16. Plaintiffs concede that none of the plaintiff class is presently eligible to receive benefits under either the unemployment insurance or T.D.I. programs. *See* note 3 *supra* and Plaintiffs' Pre-Trial Brief at 2.

equitable findings. While the Court is mindful of the difficulty involved in the defendant compiling such hard data relative to administrative burdens, the Court must have this information before it can rule intelligently on this issue. Since the data necessary to support defendant's position must be found in statistical materials which are solely within defendant's control, the burden must of necessity fall on defendant to document its position with hard data,[17] rather than through conclusory statements supported by mere speculation. While a complete and accurate account of total benefits to be paid and total administrative cost of such payments would undoubtedly necessitate notice to the class and scanning the records of every possible retroactive claimant, the Court is of the opinion that short of this, relatively reliable approximations can be presented to the Court based on testimony of statisticians and other expert witnesses, which testimony could then be subject to cross-examination or rebuttal by plaintiffs. At this juncture, the Court simply does not have before it the data upon which it can objectively weigh the equities.[18] In the absence of a final ruling with regard to retroactive benefits, I am of the opinion that it would be improper and premature for the Court to order notification to all class members, either individually or by publication. A proper notification procedure can be worked out if and when this Court determines whether such benefits should be awarded.

Therefore, defendant will be given a period of 60 days to compile more precise statistical evidence to support her position that, based on the equities herein, an order of retroactive benefits should be denied, even absent any Eleventh Amendment bar. Order to be entered in accordance with this opinion.

17. *See* Jordan v. Weaver, 472 F.2d 985, 993 n. 14, rev'd on other grounds sub nom. Edelman v. Jordan, *supra.*

18. Certain charts were compiled by defendant as part of her post-trial brief, but such cost

estimates have never been introduced in evidence or subject to cross-examination or rebuttal by opposing counsel.