CLAY, Circuit Judge,
dissenting.
Just a few months ago, a panel of this Court recognized that in assessing whether an entity enjoys Eleventh Amendment immunity, “the most important factor is ‘will a State pay if the defendant loses?’ ” Cash v. Hamilton County Dep’t of Adult Probation, 388 F.3d 539, 545 (6th Cir.2005) (quoting Brotherton v. Cleveland, 173 F.3d 552, 560 (6th Cir.1999)). The majority rests its finding of immunity on unenforceable provisions of the Michigan Constitution and various state statutes that appear to require the State to provide appropriate funding for the Judges Retirement System (“JRS”); however, in light of the Michigan Supreme Court’s decision in Musselman v. Governor of Michigan, 448 Mich. 503, 533 N.W.2d 237 (1995), it is undisputed that Plaintiffs could not obtain a judgment requiring the State treasury to honor its supposed obligation to fund the JRS, which, in fact, is no obligation at all. The State’s fulfillment of its “duty” to insure the integrity of the JRS is entirely voluntary, and therefore, that “duty” cannot provide the JRS with immunity under the Eleventh Amendment. Because the State treasury would not be potentially liable if Plaintiffs were successful in their suit against the JRS, the most important rationale for Eleventh Amendment immunity is absent. Furthermore, even if the majority were correct that the JRS is protected by Eleventh Amendment immunity, one of Plaintiffs’ central claims for relief-an injunction barring the JRS from requiring non-36th District judges from contributing a higher percentage of their compensation for their retirement allowance than is contributed by 36th District judges-would nonetheless survive under the Ex parte Young exception, as the claim is for prospective relief to remedy an alleged violation of the Equal Protection Clause, and need not involve any monetary cost to the JRS. I therefore respectfully dissent.
I.
A. Protection of the State Treasury
“[T]he impetus for the Eleventh Amendment” is “the prevention of federal-court judgments that must be paid out of a State’s treasury,” Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994); therefore, the starting point for determining whether the JRS is entitled to assert Eleventh Amendment immunity is to ask who would be responsible for a judgment against the JRS. See S.J. v. Hamilton County, 374 F.3d 416, 422 (6th Cir.2004); see also Hess, 513 U.S. at 48, 115 S.Ct. 394 (“Courts of Appeals have recognized the vulnerability of the State’s purse as the most salient factor in Eleventh Amendment determinations.”); Dubuc v. Mich. Bd. of Law Exam’rs, 342 F.3d 610, 615 (6th Cir.2003) (“[T]he primary issue is whether the state would ultimately be liable for any money judgment against the entity.”,); Alkire v. Irving, 330 F.3d 802, 811 (6th Cir.2003) (citing Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997)) (“The Supreme Court has now explicitly told us that [the issue of who would pay for a damage judgment against the defendant] is the most important factor bearing on the Eleventh Amendment question.”). In performing this inquiry, both this Court and the Supreme Court have emphasized that state law is important to the Eleventh Amendment analysis, because state law defines the nature of the entity claiming immunity. See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (stating that the “answer” to whether an *374 entity is considered an arm of the state or a political subdivision “depends, at least in part, upon the nature of the entity created by state law”); Hall v. Med. Coll. of Ohio, 742 F.2d 299, 303-04 (6th Cir.1984) (noting that state “decisions and laws shedding light on the relationship of the [entity] to the state government are important, and potentially controlling”).
In Musselman, the Michigan Supreme Court held that State courts lack the power to compel the State legislature to appropriate funds to fulfill the obligation set forth in Art. IX, § 24 of the Michigan Constitution to satisfy the accrued financial benefits of each State pension plan. See 533 N.W.2d at 246 (holding that “[t]he only defendant with authority to appropriate funds from the treasury is the Legislature,” and in the context of funding State pension plans, the court “lacks the power to require the Legislature to appropriate funds”). As explained by the Musselman court,
This was the understanding of the drafters of art. 9, § 24, who likewise did not contemplate that the prefunding requirement could be enforced by a court. They expected that the decision to comply rested ultimately with the Legislature, whom the people would have to trust:
It is the intention that we will put in each year enough in every fund to take care of the liability occurring during that year, so it will not go farther and farther behind.
... [But] there is no way to compel the legislature to appropriate money. There is no way that I know of to compel a city council to raise more money. We have to put some faith in somebody, and this is being put in the legislature. [1 Official Record, Constitutional Convention of 1961, p. 773 (delegate Brake).]
In other words, insofar as the plaintiffs are asking us to require the Legislature to appropriate funds for retirement health care benefits, we understand that the intention of the drafters was that the second sentence of Const.1963, art. 9, § 24 is not self-executing. Because the provision is necessary to appropriate funds, it fails to “lay down rules by means of which [its] principles may be given the force of law.”
Id. (quoting Davis v. Burke, 179 U.S. 399, 403, 21 S.Ct. 210, 45 L.Ed. 249 (1900) (quotation and citation omitted)). Thus, Musselman stands for the principle that a legal action cannot be maintained in a Michigan state court to compel the State to use treasury funds to fulfill the mandate of Art. IX, § 24. It follows, then, that Art. IX, § 24 cannot provide the basis for any subsequent legal action in federal court to compel the State to devote treasury funds towards fulfilling a judgment against a retirement system such as the JRS. The Eleventh Amendment would clearly bar any action to compel the State legislature to act, inasmuch as the legislature is an arm of the State. Cf. Eldridge v. Gibson, 332 F.3d 1019, 1021-22 (6th Cir.2003) (state court “is clearly a branch of the state and as such is protected from suit by the Eleventh Amendment”); Johns v. Supreme Court of Ohio, 753 F.2d 524, 526 (6th Cir.1985) (holding that suit against justices of State Supreme Court was barred by Eleventh Amendment as the State was clearly “the real party in interest”). Further, because there can be no legal action to enforce the Michigan Constitution against the State treasury, there can be no such action to enforce any of the relevant Michigan statutes against the State treasury. In other words, there can be no action in any cowi to force the State treasury to pay any part of a judgment relating to a federal claim in a law *375 suit concerning the JRS; therefore, the State treasury is not subject to any potential legal liability. See Doe, 519 U.S. at 431, 117 S.Ct. 900 (holding that the underlying legal question in Eleventh Amendment immunity analysis “is the entity’s potential legal liability”).
The majority purports to recognize that, under the Supreme Court’s decisions in Hess and Doe, the State treasury’s potential legal liability is the most important factor in the Eleventh Amendment analysis, yet it rejects Plaintiffs’ argument that, in light of Musselman, the State treasury faces no potential legal liability from an adverse judgment against the JRS. According to the majority, acceptance of Plaintiffs’ argument would preclude sovereign immunity in all cases, including those cases where the State is a named defendant, because most states have constitutions that mandate legislative, rather than judicial, control of the treasury. Therefore, the majority’s argument goes, “the more vigorously a State protected its treasury from judicial encroachment in state court the more vulnerable it would be to money-damages claims in federal court.” See Maj. Op. Part II.C. This argument has facial appeal, but one need not go any further than Hess to see that it is fundamentally flawed. Because the ‘impetus’ for the Eleventh Amendment is protection of the State treasury from federal-court judgments, “[t]he purpose of the immunity ... largely disappears when a judgment against the entity does not entail a judgment against the state.” Jacintoporb Corp. v. Greater Baton Rouge Port Comm’n, 762 F.2d 435, 440 (5th Cir.1985) (quoted in Hess, 513 U.S. at 49, 115 S.Ct. 394); see also Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth., 991 F.2d 935, 942-3 (1st Cir.1993) (quoted in Hess, 513 U.S. at 48, 115 S.Ct. 394) (“First, and most fundamentally, [the entity’s] inability to tap the Commonwealth treasury or pledge the Commonwealth’s credit leaves it unable to exercise the power of the purse. On this basis, [the entity] is ill-deserving of Eleventh Amendment protection.”). Where, as here, a judgment against the entity would not open up the State treasury to any potential legal liability, Hess teaches that the entity is not entitled to assert Eleventh Amendment immunity.
B. Importance of Other Factors in Eleventh Amendment Immunity Analysis
While the most important factor in Eleventh Amendment immunity analysis is “the prevention of federal-court judgments that must be paid out of a State’s treasury,” Hess, 513 U.S. at 48, 115 S.Ct. 394, the majority relies on the statement that “the sovereign immunity doctrine is about money and dignity,” S.J., supra, 374 F.3d at 421 (emphasis in original).[1]
*376 While it is undoubtedly true that “current Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system,” Hess, 513 U.S. at 39, 115 S.Ct. 394, and that there may be other factors in the immunity analysis, this Court’s Eleventh Amendment cases make clear that after Hess and Doe, the most significant factor is the State treasury’s potential legal liability. See Cash, 388 F.3d at 545; Dubuc, 342 F.3d at 615; Alkire, 330 F.3d at 811; Brotherton, 173 F.3d at 560. Further, our post-Ness cases imply that where, as here, it is clear that the State treasury has no potential legal liability, the importance of the other factors in the immunity analysis is diminished. For example, in Dubuc, we concluded that where no evidence was presented regarding the issue of whether the funds to satisfy a judgment would come from the State treasury, the other factors may be considered. See 342 F.3d at 615 (“The parties have not submitted any evidence regarding whether the State of Michigan would be ultimately responsible for any money judgment against the Board or the Bar. The other factors, however, weigh in favor of finding the Board and the Bar immune from this lawsuit.”). By implication, then, if the evidence overwhelmingly demonstrates that the State will not be responsible for a judgment against the defendant entity, consideration of the other factors is unnecessary. This is consistent with our analysis in Brother-ton, where, because it was clear that the State would not be responsible for paying a judgment against the defendants, we found it unnecessary to determine whether Hess ’ emphasis on the State treasury is “dispositive,” or rather, whether it “plac[es] significant weight on one factor of a multi-factor test.” 173 F.3d at 561. Not only does this statement demonstrate that the State treasury issue is clearly the most important factor after Hess, it strongly suggests that where it is clear that the State will not be responsible for paying a money judgment against the entity, the other factors are unimportant. Thus, the majority’s reliance on other factors is unavailing given that it is clear the State of Michigan has no potential legal liability for a judgment against the JRS.
Even assuming that factors other than the State treasury liability issue have some relevance in the instant case, they still would not cut in favor of immunity, in part because some of those other factors also cut in favor of finding the JRS akin to a municipality rather than a political subdivision. Functionally, the JRS is more aptly characterized as proprietary rather than governmental, because the JRS operates for profit and for the material benefit of itself and its beneficiaries, not for the material benefit of the general public.[2] Additionally, the JRS enjoys a fair degree of autonomy. See, e.g., Mich. Comp. Laws § 38.2204(1) (“The retirement board has *377 the rights, authority, and discretion in the proper discharge of retirement board duties pursuant to the executive organization act of 1965, Act No. 380 of the Public Acts of 1965 .... ”)• It is undisputed that the JRS can sue and be sued in state court, and that it has the authority to enter into contracts with private individuals or corporations. See Mich. Comp. Laws § 38.2205. Further, the record reflects that the JRS has contracted with the State and paid the State money for things such as building rentals, technological support, investment services, and fees to the Attorney General. Although other factors in the immunity analysis may weigh in favor of finding that the JRS is an arm of the state, balanced against the state treasury liability issue, the most important factor, as well as the JRS’s proprietary function, autonomy and contracting abilities, it is clear that the JRS is not entitled to assert Eleventh Amendment immunity. The majority’s conclusion to the contrary misses the mark entirely.
Finally, the majority’s citation to other cases that it claims “have held that state employee retirement systems are arms of the State” is unpersuasive. See Maj. Op. Part II.B. While on the surface these cases may appear to support the majority’s position, upon closer examination it is clear that most are distinguishable or, at the very least, are of questionable import inasmuch as they fail to recognize that the paramount issue is the State treasury’s potential legal liability. For example, Fitzpatrick v. Bitzer is distinguishable because unlike the JRS, the Connecticut Retirement Fund at issue in that ease had “none of the indicia of independence from the state, such as separate incorporation or a power to sue in its own name.” 519 F.2d 559, 565 (2d Cir.), rev’d in part on other grounds, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). In Fitzpatrick, “[a] judgment against the fund would thus automatically increase the obligations of the general state treasury and amount to a judgment against the state.” Id. (emphasis added). Far from being automatic, the State’s potential legal liability here is entirely hypothetical, given that the State legislature has no enforceable obligation to fund the JRS. Cf. Boatmen’s First Nat’l Bank of Kansas City v. Kan. Pub. Employees Ret. Sys., 915 F.Supp. 131, 137-38 (W.D.Mo.1996) (“[T]o show a greater connection to the state treasury, KPERS relies on a more attenuated scenario-the theoretical possibility that someday KPERS will incur an enormous judgment that will require it to increase the rate of employer contributions to make up the shortfall. KPERS asserts that this hypothetical and roundabout connection to the Kansas state treasury is sufficient to satisfy the Hess standard. The Court disagrees. The mere possibility of having to pay for a judgment is simply not good enough.”); Bowen v. Hackett, 387 F.Supp. 1212, 1221 (D.R.I.1975) (“The fact that the General Assembly may feel morally obligated to replenish the funds in time of emergency is of no consequence. Such a possible ancillary effect on the state’s general treasury is simply too attenuated to bring the Eleventh Amendment into play.”) (citation omitted). Similarly, in Hair v. Tenn. Con-sol. Ret. Sys., another case cited by the majority, the retirement system at issue had to submit a budget request to the State legislature for its annual operating-expenses, and thus a judgment against the entity “would require a special appropriation from the [Tennessee] General Assembly.” 790 F.Supp. 1358, 1364 (M.D.Tenn.1992). Again, this situation is distinguishable from the JRS, which pays its own operating expenses.
Other cases cited by the majority fail to perform any meaningful analysis of Eleventh Amendment immunity, or rely on al *378 together faulty reasoning. See, e.g., JMB Group Trust IV v. Penn. Mun. Ret. Sys., 986 F.Supp. 534, 538 (N.D.Ill.1997) (holding, in contravention of Hess, that because retirement system is “subject to the direction and control” of the State, “the court need not address whether a judgment against the PMRS would have an effect upon the Pennsylvania State Treasury”); Sculthorpe v. Va. Ret. Sys., 952 F.Supp. 307, 309-10 (E.D.Va.1997) (finding without analysis that retirement system is an arm of the state); Mello v. Woodhouse, 755 F.Supp. 923, 926 (D.Nev.1991) (same); Reiger v. Kan. Pub. Employees Ret. Sys., 755 F.Supp. 360 (D.Kan.1990) (short memorandum and order finding, without analysis, that retirement system is an arm of the state); United States v. South Carolina, 445 F.Supp. 1094, 1099-1100 (D.S.C.1977) (finding without analysis that retirement system is an arm of the state).
The majority impermissibly departs from clear Supreme Court and Sixth Circuit precedent by holding that the JRS is entitled to assert Eleventh Amendment immunity. Under existing case law, most notably Hess, the most important factor in the Eleventh Amendment analysis-the State treasury’s potential legal liability-is clearly not implicated here. Neither the other possible factors in the Eleventh Amendment immunity analysis, nor the other retirement system cases cited by the majority, alter the fact that Musselman makes clear that the State has no obligation to fund the JRS, and it could not be forced to pay a judgment on the JRS’ behalf. Therefore, the JRS is not entitled to assert Eleventh Amendment immunity.
II.
Plaintiffs’ Complaint includes claims for retrospective monetary relief, as well as claims for injunctive and declaratory relief. Even assuming arguendo that there is a potential threat to the State’s coffers that is sufficiently palpable to justify Eleventh Amendment immunity from Plaintiffs’ claims for retrospective relief, the same threat does not exist regarding Plaintiffs’ claims for prospective relief.
The majority inappropriately recasts all of Plaintiffs’ claims as requests for monetary relief. Plaintiffs’ central claim is that the Judges Retirement Act violates the Equal Protection Clause by affording more favorable treatment to 36th District judges. Plaintiffs’ Complaint requests, inter alia, that the Court “[preliminarily and permanently enjoin Defendants from requiring those Plaintiffs and members of The Class who have remained as participants in the Tier I Plan to contribute a higher percentage of their compensation for a retirement allowance than judges of the 36th District Court[.]” Complaint at 24 ¶ 3; Joint Appendix, “J.A.,” at 32-3. According to the majority, “[tjhrough this claim ... plaintiffs seek to obtain the same level of benefits while paying a lower contribution amount, a remedy that would require the State to make up the difference and that accordingly constitutes a direct request for monetary relief.” Maj. Op. Part IV. However, an alternative remedy exists that would not threaten the State treasury.[3] If a court were to find in *379 favor of Plaintiffs on their equal protection claim, it could simply mandate that the JRS stop affording the judges of the 36th District Court more favorable treatment. In other words, equality could be obtained by requiring the 36th District judges to contribute a higher percentage, rather than reducing the percentage that non-36th District judges contribute. This remedy would not only eliminate the allegedly unconstitutional classification of judges, but would actually cost the JRS less money than the current system. See Heckler v. Mathews, 465 U.S. 728, 740, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) (quoting Iowa-Des Moines Nat’l Bank v. Bennett, 284 U.S. 239, 247, 52 S.Ct. 133, 76 L.Ed. 265 (1931)) (“[Wjhen the ‘right invoked is that of equal treatment,’ the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class.”) (emphasis in original); see also Davis v. Mich. Dep’t of Treasury, 489 U.S. 803, 818, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (“In this case, appellant’s claim could be resolved either by extending the tax exemption to retired federal employees (or to all retired employees), or by eliminating the exemption for retired state and local government employees.”); cf. Kelley v. Metro. County Bd. of Educ., 836 F.2d 986, 993 (6th Cir.1987) (discussing situation where court ordered the payment of equal benefits to two groups that had been receiving disparate benefits, and noting that equalization “would necessarily entail a corresponding decrease in payments” to entities previously receiving the higher benefit, thus “[t]he ancillary effect of the order on the state’s treasury would be absolutely nil, except insofar as the state might elect voluntarily to increase appropriations from the general funds of the state .... ”). The same principle applies to Plaintiffs’ request for an order providing that members of the Tier I Plan who have not yet retired be afforded a retirement allowance equal to similarly situated judges of the 36th District Court. See Compl. at 25 ¶ 5; J.A. at 33. Such an order would result in less of a potential drain on the JRS if the JRS merely reduced the retirement allowances of 36th District judges to the allowance level afforded all other judges. Cf. Heckler, 465 U.S. at 740, 104 S.Ct. 1387. Accordingly, at the very least, the Court should deny immunity for these types of claims for prospective relief.
*380 The majority’s analysis of Plaintiffs’ request for injunctive prospective relief to redress an alleged violation of the Equal Protection Clause due to the disparity between 36th and non-36th District judges is also inconsistent with Papasan v. Allain, 478 U.S. 265, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). In discussing the plaintiffs’ claim for prospective relief to remedy an ongoing equal protection violation, the Supreme Court in Papasan stated:
This alleged ongoing constitutional violation-the unequal distribution by the State of the benefits of the State’s school lands-is precisely the type of continuing violation for which a remedy may permissibly be fashioned under [Ex parte ] Young. It may be that the current disparity results directly from the same actions in the past that are the subject of the petitioners’ trust claims, but the essence of the equal protection allegation is the present disparity in the distribution of the benefits of state-held assets and not in the past actions of the State. A remedy to eliminate this current disparity, even a remedy that might require the expenditure of state funds, would ensure “ ‘compliance in the future with a substantive federal-question determination’ ” rather than bestow an award for accrued monetary liability.
... [W]e agree with the Court of Appeals that the Eleventh Amendment would not bar relief necessary to correct a current violation of the Equal Protection Clause and that this claim may not be properly dismissed on this basis.
Id. at 282, 106 S.Ct. 2932 (quoting Milliken v. Bradley, 433 U.S. 267, 289, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (quoting Edelman v. Jordan, 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974))) (emphasis in original).[4] As in Papasan, Plaintiffs here allege a present and ongoing violation of the Equal Protection Clause. The injunc-tive relief sought by Plaintiffs to remedy the disparity in the contributions of, and disbursements to, 36th District judges and non-36th District judges is purely prospective, and would therefore ensure future compliance with the federal constitution. Id. Under the Supreme Court’s reasoning in Papasan, the Eleventh Amendment is not a bar to such relief; thus, the majority’s dismissal of Plaintiffs’ claim for prospective injunctive relief is improper.
Although it is clear that the JRS could remedy the alleged inequities between 36th and non-36th District judges without expending additional funds, the Eleventh Amendment would not bar Plaintiffs’ request for prospective injunctive relief even if the JRS was required to pay additional monies in order to comply with the Equal Protection Clause. This is because Papa-san teaches that “relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.” Id. at 278, 106 S.Ct. 2932; see also Edelman, 415 U.S. at 668, 94 S.Ct. 1347 (“[A]n ancillary effect on the state treasury is a permissible and often an inevitable consequence of the principle an *381 nounced in Ex parte Young.”). “A court may enter a prospective injunction only if the monetary impact is ancillary, i.e., not the primary purpose of the suit.” Barton v. Summers, 293 F.3d 944, 950 (6th Cir.2002). In the instant case, even if an injunction barring the state from requiring non-36th District judges to contribute a higher percentage of their compensation required a larger outlay of funds by the JRS, any such expenditure would be ancillary to the primary purpose of the injunc-tive relief, which is to remedy an alleged violation of the Equal Protection Clause. By its plain terms, the purpose of the request for injunctive relief is to enjoin Defendants from requiring Plaintiffs and class members who are Tier 1 Plan participants “to contribute a higher percentage of their compensation for a retirement allowance than judges of the 36th District Court[.]” Compl. at 24-25 ¶ 3; J.A. at 32-33. In other words, Plaintiffs are not requesting a direct monetary award in ¶ 3, but rather, an equal playing field in the percentage that 36th and non-36th District judges must pay into the Tier 1 Plan. If, “as a necessary consequence of compliance in the future with a substantive federal-question determination,” the State must pay additional costs, the Eleventh Amendment is not implicated because any effect on the State treasury is purely ancillary. Edelman, 415 U.S. at 668, 94 S.Ct. 1347.[5] Thus, the Eleventh Amendment is not implicated by Plaintiffs’ request for an injunction barring the state from requiring greater percentage contributions from non-36th District judges.
III.
The central concern of the Eleventh Amendment is the protection of state treasuries from potential legal liability. In the instant case, there is no question that the State treasury would not be responsible for a judgment against the JRS; the State has no enforceable obligation to fund the JRS, and the State could not be required to pay a judgment on behalf of the JRS. By finding that the Eleventh Amendment is applicable even where the impetus for immunity is clearly not implicated, the majority impermissibly broadens the ambit of the amendment. Allowing the JRS to assert immunity extends the scope of the Eleventh Amendment far beyond what either this Court or the Supreme Court have previously identified as its limits. I must therefore respectfully dissent.[6]

. At least one commentator has persuasively argued that the “dignity” rationale does little to protect state interests, and may actually cut against state sovereign immunity and in favor of civil liability. See Ernest A. Young, State Sovereign Immunity and the Future of Federalism, 1999 Sup. Ct. Rev. 1, 53-4. Quoting Justice Wilson's statement in Chisolm v. Georgia (the case that prompted the Eleventh Amendment), that “ '[a] State; useful and valuable as the contrivance is, is the inferior contrivance of man; and from his native dignity derives all its acquired importance.' " Professor Young notes that “[a] state has an interest in preserving the integrity of its internal decision-making processes, for example, because that will insure that it remains responsive and accountable to its citizens and not to some other body.” Id. at 53 (quoting Chisolm v. Georgia, 2 U.S. (2 Dall) 419, 455, 1 L.Ed. 440 (1793)) (Opinion of Wilson, J.). Defining dignity “as the credibility of public institutions,” Young concludes that dignity “might cut in favor of civil liability,” because "[i]n our constitutional tradition, confidence in the government arises rather directly from *376 the proposition that the government is subject to the rule of law.” Id. at 54 (citing Andrzej Rapaczynski, From Sovereignty to Process: The Jurisprudence of Federalism After Garcia, 1985 Sur. Ct. Rev. 341, 357). Thus, "the dignitary argument is far from compelling when placed in the context of modern sovereign immunity doctrine.” Id.

. A "governmental function” is defined as the legally authorized conduct of a government agency "that is carried out for the benefit of the general public.” Black's Law Dictionary (7lh ed.1999). Conversely, a "proprietary function” is "[a] municipality's conduct that is performed for the profit or benefit of the municipality rather than for the benefit of the general public.” Id. at 1235. Although one could argue that a financially stable judicial retirement system benefits the public to the extent that it contributes to the retention of judges and the smooth functioning of the judiciary, the JRS nevertheless is primarily proprietary in nature.

. In Part IV of its opinion, the majority incorrectly construes several portions of the Complaint as expressly requesting that the JRS increase Plaintiffs’ benefits. For example, Plaintiffs request "an annual percentage increase in retirement allowance equivalent to the annual percentage increase afforded to by other state funded retirement systems.” The
majority argues that the JRS can only make the benefits equal by increasing the benefits of others. If the state lowered the percentage increase to all retirement systems, however, it would be in compliance with the requested relief without increasing Plaintiffs’ benefits. Similarly, Plaintiffs’ request for an injunction precluding the JRS from forcing them to *379 "contribute a higher percentage of their compensation for a retirement allowance than the judges of the 36th District Court,” can be accomplished by raising the 36th District judges' contribution rates. In fact, this holds true of all the relevant examples cited by the majority.
Recognizing this problem, the majority attempts to argue that the Michigan Constitution prevents the JRS from lowering vested benefits, and thus, leaves them with the sole alternative of raising Plaintiffs’ benefits. This provision, however, has limited applicability. First, it does not prevent the JRS from changing how benefits accrue in the future. In re Enrolled Senate Bill 1269, 209 N.W.2d at 200, 203 (Mich.1973) ("[B]ut we think [the Michigan legislature] may properly attach new conditions for earning financial benefits which have not yet accrued. Even though compliance with new conditions may be necessary in order to obtain the financial benefits which have accrued, we would not regard this as a diminishment or impairment ....”). Changing how benefits accrue certainly enables the JRS to alter the conditions of its plans without incurring huge expenses. Moreover, this provision has no effect on the JRS's ability to raise the contribution rates of 36th District judges in order to equalize all beneficiaries contributions. Id. at 201, 203 (holding that the Michigan legislature could raise contribution rates without granting a corresponding increase in benefits without violating article IX, section 24 of the Michigan Constitution). Thus, the JRS does not necessarily incur additional costs by raising contributions.

. Papasan involved essentially two claims, a claim for trust income benefits and an equal protection claim, both relating to the allegedly unequal distribution of public school land. The Court denied relief on the trust claim, because "the trustee is required, because of past loss of the trust corpus, to use its own resources to take the place of the corpus or the lost income from the corpus.” Papasan, 478 U.S. at 281, 106 S.Ct. 2932. This problem is not presented by Plaintiffs' claim for prospective injunctive relief, because, as is discussed above, equality in contributions and in the disbursement of benefits to 36th and non-36th District judges, going forward, can be accomplished without reducing the amount of funds in the trust.

. See also Quern v. Jordan, 440 U.S. 332, 349, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (holding that state could be required to provide notice to welfare recipients that they may be eligible for past benefits, and that the cost of such notice is ancillary to prospective relief awarded by the district court); Milliken, 433 U.S. at 289-90, 97 S.Ct. 2749 (upholding injunctive relief requiring state to pay the future costs of educational components in order to "wipe out continuing conditions of inequality produced by the inherently unequal dual school system long maintained in Detroit.”); Thomson v. Harmony, 65 F.3d 1314, 1321 (6th Cir.1995) (stating that "expense of implementing” requested relief of reinstatement to job, support as researcher and removal of negative personnel record entries would be ancillary to purpose of suit); Doe v. Wigginton, 21 F.3d 733, 737 (6th Cir.1994) (finding that if injunctive relief ordering state to provide HIV tests to prison inmates upon request were granted, cost of tests would have an ancillaiy effect on state treasury).

. Because I believe that the Eleventh Amendment is not implicated here, and would hold that the district court improperly dismissed Plaintiffs' claims, it is unnecessary for me to reach the final two issues discussed by the majority, i.e., whether the district court dismissed Plaintiffs’ claims with or without prej *382 udice, and whether Plaintiffs were prejudiced by the district court's failure to specify whether it was dismissing under Rule 12 or Rule 56.