**COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF ENVIRONMENTAL RESOURCES, Plaintiff,**

v.

**WILLIAMSPORT SANITARY AUTHORITY, and all other Pennsylvania municipal authorities, municipalities or persons similarly situated et al., Defendants.**

Civ. No. 79–690.

United States District Court,
M. D. Pennsylvania.

Sept. 15, 1980.
As Corrected Nov. 20, 1980.

---

Michael S. Alushin, Asst. Atty. Gen., DER, Harrisburg, Pa., for plaintiff.

Ann S. Pepperman, Brett O. Feese, McNerney, Page, Vanderlin & Hall, Williamsport, Pa., for defendants.

## OPINION

MUIR, District Judge.

### I. Introduction.

This case requires the Court to determine whether the Commonwealth of Pennsylva-

nia, Department of Environmental Resources (DER) or the Williamsport Sanitary Authority was entitled to the $198,600.00 paid to DER in July 1974 by the United States Environmental Protection Agency (EPA) pursuant to § 206(a) of the 1972 amendments to the Water Pollution Control Act, 33 U.S.C. § 1286(a). If the Court concludes that the Sanitary Authority was entitled to the money, the Court must determine whether the Eleventh Amendment bars relief in this case.

An action for declaratory relief was commenced by DER in the Commonwealth Court of Pennsylvania and removed to this Court pursuant to 28 U.S.C. § 1441. The Authority has asserted counterclaims for damages, declaratory relief, and injunctive relief. The Court has previously dismissed the counterclaims against DER because they are barred by the Eleventh Amendment. Because the individual counterclaim defendants are being sued in their official capacities, the Court will refer to them as DER.

The case was tried to the Court from August 25 to August 27, 1980. The following constitute the Court's findings of fact, discussion, and conclusions of law.

## II. Findings of Fact.

1. The Plaintiff is the Commonwealth of Pennsylvania, Department of Environmental Resources (DER) with principal offices at 9th Floor, Fulton Building, 3rd and Locust Streets, Harrisburg, Pennsylvania, 17120 (Undisputed fact, hereinafter designated U).

2. The Defendant and Counterclaim Plaintiff is the Williamsport Sanitary Authority, WSA, the Sanitary Authority or the Authority. (U)

3. The WSA is a municipal corporation incorporated pursuant to the terms of the Municipality Authorities Act of 1945, 53 P.S. §§ 301 et seq. Its principal office and place of business is at 253 West Fourth Street, Williamsport, Pennsylvania, 17701. (U)

4. Counterclaim Defendant Clifford L. Jones is Secretary of the Commonwealth Department of Environmental Resources. He has held this position since February 1979. (U)

5. Counterclaim Defendant Louis W. Bercheni is Director, Bureau of Water Quality Management, Commonwealth Department of Environmental Resources. He has held this position since February 1980. From April 1979 until February 1980 he held the position of Acting Director, Bureau of Water Quality Management. (U)

6. Counterclaim Defendant Cedric Karper is Chief, Planning and Evaluation Section, Division of Sewerage and Grants, Commonwealth Department of Environmental Resources. He has held this position since April 1979. (U)

7. Counterclaim Defendant Mark Roller is Regional Director, Environmental Protection, Commonwealth Department of Environmental Resources. He has held this position since June 1978. From January 1970 until June 1978 he was Williamsport Regional Sanitary Engineer, Commonwealth Department of Environmental Resources. (U)

8. The WSA initially constructed its sewerage facilities in 1953. (U)

9. The WSA facilities consist of two plants, the Central Plant and the West Plant, both of which facilities are owned by the WSA. (U)

10. The cost of these sewerage facilities was $5,100,000.00. (U)

11. The funding for this project was provided from local funds, to–wit, a bond issue in the amount of $5,100,000.00, with the exception of a state grant–in aid in the amount of $26,725.54 toward the engineering expenses for the project paid to the City of Williamsport. (U)

12. No federal funding was received for the initial construction project. (U)

13. In 1969, the WSA received an order from the Commonwealth Department of Health, one of the predecessor agencies to DER, instructing the WSA to upgrade its treatment at its two sewage treatment plants, the Central Plant and the West Plant, to secondary treatment. (Defendant's Exhibits 122–123). (U)

14. The purpose of this upgrading was to protect the waters of the Susquehanna River. (U)

15. The upgrading took the form of a planning, design, and construction project, hereinafter for reference purposes only sometimes referred to as "Project No. 420486", "Project No. C–420486", or "Project WPC Pa. 486". (U)

16. This construction project to upgrade the WSA's facilities undertaken by the WSA and for which the WSA was responsible was solely the WSA's construction project.

17. The WSA, not DER, designed and planned Project No. 420486, contracted with the engineers for this project, and entered into the construction contracts with the contractors.

18. The WSA, not DER, was responsible for the day–to–day operations of and general supervision of Project No. 420486.

19. The WSA, not DER, had both the direct and ultimate financial responsibility for Project No. 420486 and for complying with the order to upgrade its sewage treatment facilities.

20. The cost of Project No. 420486 was $4,094,752.86. (U)

21. The "eligible costs" of Project No. 420486 were $4,060,752.86. (U)

22. "Eligible costs" as used herein means costs which can be included for federal construction grant participation. (U)

23. The WSA applied for a federal construction grant under § 8(b) of the Federal Water Pollution Control Act, P.L. 84–660, for its construction Project No. 420486.

24. The WSA applied for state grant funds under the Pennsylvania Land and Water Conservation and Reclamation Act, Act No. 443 of 1968, 32 P.S. §§ 5101 et seq., in particular, under 32 P.S. § 5116 (hereinafter referred to as "Act 443"). (U)

25. The WSA originally applied for and was awarded a grant in the amount not to exceed $851,600.00 from the DER. (U)

26. At the time the state grant of $851,-600.00 was made, § 206(a) had not yet been enacted. (U)

27. The WSA's grant was later adjusted, because the actual construction costs of the project were less than the amount estimated at the time of the application, to $802,-400.00. (U)

28. The WSA received $802,400.00 in state grant funds under Act 443. This was the full amount authorized by the grant offer. (U)

29. The WSA's state grant was awarded under Act 443, in particular, under 32 P.S. § 5116. (U)

30. The WSA's state grant contained, *inter alia*, the following Terms of Offer:

1. In the event the actual cost of the project is less than the estimated cost upon which the grant offer is based, such actual cost shall be used to determine the amount of the state grant and the grant shall be reduced as necessary.

2. Project accounting and fiscal records relative to state grant assistance shall be maintained and be accessible to duly authorized representatives of the DER for the purpose of audit and examination.

3. All funds granted pursuant to the Land and Water Conservation and Reclamation Act shall be expended solely for carrying out the approved project.

4. The applicant must adhere to the project construction schedule listed on the federal application form, except that under item c.2. the time limit must not be greater than 100 days. Any required additional documentation must be submitted within 30 days of request. (U)

31. Since January, 1978, the DER has been using a new form for grants awarded under the Pennsylvania Land and Water Conservation and Reclamation Act, Act 443. This new form for state grants includes the following condition: "If any additional Federal funds become available for this project, it is the Commonwealth of Pennsylvania's intent to recoup any or all of the Land and Water Conservation and Reclamation Act funds paid to the Authority for this project." (Exhibit D14) (U)

32. The state grant offer was signed by William Saltzer on behalf of the DER on February 24, 1971 and was accepted on behalf of the WSA by John C. Youngman, Sr., on March 3, 1971. (U)

33. The WSA used the grant it received under the Pennsylvania Land and Water Conservation and Reclamation Act, Act 443, for construction of its secondary sewage treatment facilities for its Central and West Plants, which secondary treatment facilities provided added protection for the waters of the West Branch of the Susquehanna River. (U)

34. The WSA has performed all of its obligations under the terms of this state grant agreement.

35. This state grant did not set forth that it was pre–financing for the federal share of Project No. 420486. (Exhibit P–3).

36. This state grant did not set forth that it was refundable or subject to reimbursement by WSA or any other party, other than in the event the actual costs of the project were less than the estimated costs on which the grant was based. (Exhibit P–3).

37. The DER administered the sewerage construction grant programs under Act 443 to accomplish two goals: (1) to qualify projects for the highest level of federal funding available in any funding year and (2) to insure equity among projects funded in any funding year by equalizing the combined federal–state grants of each year.

38. The 1971 Grant Agreement between the DER and the WSA contains no provision barring Pennsylvania DER from accepting subsequent federal funding to augment its Act 443 grant program.

39. The 1971 Grant Agreement between the DER and the WSA contains no promise by the DER to forego any subsequent federal funding which may become available to augment its state grant program.

40. There is no provision in the 1971 Grant Agreement between the DER and the WSA by which the DER agreed to pay to the WSA federal funds for which the DER may become eligible after the execution of the 1971 Grant Agreement.

41. There is no provision in the 1971 Grant Agreement between the DER and the WSA by which any individual counterclaim Defendant in his official capacity agreed to pay any § 206(a) money to the WSA.

42. Since 1954, WSA has received an annual grant for its operating costs in the amount of 2% of the construction costs of its facilities, less the amount of any federal or state construction assistance under Act 339 of 1953, 35 P.S. §§ 701–703, hereinafter Act 339.

43. The grant payments made to WSA under Act 339 were placed into the WSA's operating budget and have been used solely for the operating costs of the WSA.

44. The grant payments made to the WSA under Act 339 were for the WSA's operating expenses, not for capital improvements or construction costs.

45. The 2% annual operating costs state grants under Act 339 received by WSA were unconditional.

46. The 2% annual operating costs state grants under Act 339 received by WSA were not prefinancing for future federal grants and were not subject to reimbursement.

47. WSA was never advised that the 2% state operating grants under Act 339 were pre–financing for future federal grants or subject to reimbursement.

48. WSA used the 2% state grants it received under Act 339 for the purposes specified by the Act and intended by DER.

49. The payments pursuant to Act 339 to the WSA prior to November 17, 1972 totalled approximately $1,121,649.00. (U)

50. The grant payments received by WSA attributable to Project 420486 pursuant to Act 339 totalled $200,835.99 for the period 1973–1978.

51. The grants pursuant to Act 339 were annual payments based on a percentage of the cost of construction and acquisition of sewage treatment plants which represent an additional state contribution to the WSA's sewage treatment plants.

52. WSA expended the funds it received under the Land and Water Conservation and Reclamation Act and under Act 339 with the understanding that the grants were outright, unconditional grants, not subject to repayment or reimbursement by WSA or any other party other than as set forth in the "Terms of Offer."

53. WSA's understanding that the state grants to it were not subject to reimbursement, other than as set forth in the "Terms of Offer," and were not pre–financing, and its expenditure of these funds based on this understanding, was reasonable and in good faith.

54. The WSA applied for a federal construction grant for Project No. 420486 under § 8(b) of the Federal Water Pollution Control Act, P.L. 84–660. (Exhibit D–2). (U)

55. State grants under both Act 339 and Act 443 were certified by the DER to be applied to meet state matching grant provisions under § 8(b) of the Federal Water Pollution Control Act, P.L. 84–660, then codified at 33 U.S.C. § 1158(b), the act in effect prior to the 1972 amendments. (Exhibits P–49 and P–56.) (U)

56. As a result of the certification under § 8(b) and the contribution of state funds under Act 339 and Act 443 WSA received a higher level of federal funding under the Federal Water Pollution Control Act, P.L. 84–660 than it would otherwise have received.

57. By letter dated February 19, 1971, Warren Carter of the U.S. EPA notified the WSA that the Authority was to be offered a federal grant in an amount not to exceed $1,703,200.00 and that the grant documents would be forwarded to the Authority through the DER and should be returned to the U.S. EPA through the DER. (Exhibit D–3.1) (U)

58. By letter dated December 3, 1971, the WSA was notified that it had received the federal grant. (Exhibit D–7) (U)

59. The WSA was awarded federal construction grant assistance under Section 8(b) of the Federal Water Pollution Control Act, P.L. 84–660, in the amount of 40% of its eligible costs. (U)

60. The $802,440.00 state grant to WSA under the Land and Water Conservation and Reclamation Act was the state matching grant for purposes of section 8(b) of the Federal Water Pollution Control Act.

61. The WSA also received a 10% planning grant under Section 8(f) of the Federal Water Pollution Control Act, P.L. 84–660. The Authority was notified of the award of a planning grant in the amount of 10% of the grant under section 8(b), $170,320.00, on August 11, 1971. (Exhibit D–46) (U)

62. The total federal grant assistance received by the WSA under the Federal Water Pollution Control Act, P.L. 84–660, was $1,765,360.00, 44% of the eligible costs. (U)

63. The WSA received all of the federal grant funding it was awarded under Sections 8(b) and (f) of the Federal Water Pollution Control Act, P.L. 84–660. (U)

64. The WSA was not eligible for the maximum amount of federal assistance under Section 8(b) of the Federal Water Pollution Control Act, P.L. 84–660, 55% of the eligible cost for Project No. 420486, because the DER had not enacted water quality standards for the West Branch of the Susquehanna River into which the Authority discharged. (U)

65. All of the municipalities and municipal authorities in Pennsylvania that received 50–55% federal funding under the Federal Water Pollution Control Act, P.L. 84–660, discharged into waters for which the Commonwealth of Pennsylvania or the appropriate agency had enacted the requisite water quality standards. (U)

66. The total federal grant assistance received by the WSA under the Federal Water Pollution Control Act, P.L. 84–660, was $1,765,360.00. (U)

67. Project No. 420486 was jointly funded by a 20% state contribution, a 44% federal contribution, and a 36% local contribution toward the total eligible project costs.

68. After being notified by telephone on April 17, 1972 that grants authorized by § 206(a) of the 1972 Amendments to the Water Pollution Control Act, P.L. 92–500, 33 U.S.C. § 1286(a), hereinafter referred to as "§ 206(a)" would be available, the DER acted speedily to notify potentially eligible parties.

69. The DER urged as many of the potentially eligible municipal corporations or municipal authorities in the Commonwealth of Pennsylvania as it could reasonably contact to apply for grant funding under § 206(a). (U)

70. The DER's contacts with these municipal corporations and municipal authorities were made through the Regional Sanitary Engineers or their staff members for the regions in which those projects were located in the Commonwealth of Pennsylvania, pursuant to guidelines provided by the Harrisburg office of the DER. (U)

71. The DER stated that the various municipal authorities and municipal corporations in the Commonwealth of Pennsylvania, including the WSA, should forward their applications for § 206(a) funds to the DER which, in turn, would forward the applications to the U.S. EPA. (U)

72. On November 17, 1972, Counterclaim Defendant Mark A. Roller telephoned L. Vernon Frye at his home. (U)

73. Neither Mark Roller nor L. Vernon Frye recall the exact words of the telephone conversation of November 17, 1972. (U)

74. In this conversation, Mr. Roller suggested that the WSA apply for a federal grant under § 206(a) for its construction project, Project No. 420486. Mr. Roller suggested that the WSA apply for the § 206(a) grant through DER and stated that DER would forward the application to EPA. Mr. Roller stated that DER would assist WSA in applying for a § 206(a) grant.

75. At the time of the conversation, Mr. Roller did not know if DER would apply for any portion of the § 206(a) grant for WSA's construction project, Project No. 420486, for DER.

76. In the November 17, 1972 telephone conversation, L. Vernon Frye did not inquire whether Mark Roller was authorized to enter a contract.

77. On November 17, 1972, L. Vernon Frye did not inquire as to what approvals were necessary for DER to enter into a contract.

78. Counterclaim Defendant Roller sent L. Vernon Frye, Executive Director of the WSA, the letter dated November 20, 1972. (Exhibit P–2) (U)

79. The letter of November 20, 1972, stated, *inter alia*, "This is to confirm our telephone call on November 17, 1972" and that "you are urged to promptly apply for funding for which your municipality or authority may be eligible." (U)

80. On the basis of the telephone conversation between Mr. Roller and Mr. Frye and the November 20, 1972 letter of Mr. Roller, the WSA reasonably understood that the § 206(a) payment for its construction project, Project No. 420486, would be paid to the WSA and that DER would assist WSA in obtaining the full section 206(a) grant.

81. On the basis of the conversation between Mr. Roller and Mr. Frye and the November 20, 1972 letter of Mr. Roller, the WSA reasonably understood that DER would assist WSA in obtaining a § 206(a) grant from EPA for WSA.

82. In making the telephone call on November 17, 1972, and in sending the letter dated November 20, 1972, Counterclaim Defendant Roller was acting upon the instructions of his superiors in the DER, Walter Lyon and Daniel Drawbaugh. (U)

83. Walter Lyon and Daniel Drawbaugh had the authority to issue the instructions contained in Exhibit D–48. (U)

84. In response to this conversation and letter, the WSA filed a letter of application for a § 206(a) grant with the U.S. EPA through the DER. (U)

85. The DER forwarded the applications for § 206(a) funds for municipal authorities and municipal corporations in the Common-

wealth of Pennsylvania, including the WSA's application, to the U.S. EPA on October 10, 1973. (Exhibit D–23) (U)

86. In processing the applications for § 206(a) funding, the DER verified the date of the initiation of the applicants' projects for the U.S. EPA. (U)

87. The DER also provided the U.S. EPA with a "reimbursement listing" of Pennsylvania projects qualified for § 206(a) funding. (Exhibit D–23). (U)

88. The DER certified the projects in Pennsylvania for EPA which DER thought eligible for § 206(a) grants.

89. The letter of application was dated November 17, 1972 and signed by L. Vernon Frye for John C. Youngman, Sr., Chairman of the WSA, upon John C. Youngman's express authorization. (Exhibit D–9) (U)

90. The WSA's letter of application for the § 206(a) funds was received by the DER. (U)

91. The instructions from Walter Lyon and Daniel Drawbaugh to Mark Roller contained no authorization for Roller to enter any contract with the WSA.

92. On November 17 and 20, 1972, Mr. Roller did not state that he had any authority to enter a contract on behalf of the DER with the WSA.

93. On November 17 and 20, 1972, Mark Roller made no offer to enter any contract with the WSA.

94. Mr. Roller's letter of November 20, 1972, contains no offer to enter a contract on behalf of the DER with the WSA.

95. On November 17 and 20, 1972, Mr. Roller did not offer to pay the WSA any § 206(a) money.

96. Mr. Roller's letter of November 20, 1972 contains no offer or promise to pay to the WSA any § 206(a) money.

97. At the time of Mark Roller's November 17 and 20, 1972 communications with the WSA, Mark Roller had not identified or secured approval of any state appropriation which would authorize a payment to the WSA.

98. Executive Directive # 95, Plaintiff's Exhibit 10, was promulgated by the Governor of Pennsylvania, Raymond Shafer, on February 4, 1970.

99. Executive Directive # 95 was in effect on November 17 and 20, 1972.

100. Executive Directive # 95 sets forth the approval process for contractual agreements entered by Pennsylvania state agencies under the Governor's jurisdiction for the period 1971–1973.

101. Executive Directive # 95 requires the following approvals for the valid execution of a contractual agreement binding upon Pennsylvania for less than $100,-000.00:

(a) The agency head (here the Secretary of DER) must approve all grant award contracts;

(b) The agency attorney is responsible for drafting the contract and must attest to its contents;

(c) The Comptroller's Office must review all contracts entered by state agencies under the Governor's jurisdiction.

102. One of the purposes of Executive Directive # 95 is to insure the availability of state appropriations to pay for contracts entered by the state.

103. Pursuant to Executive Directive # 95, all contracts of any nature for $100,-000.00 or more were required to be submitted to the Bureau of Systems Analysis, Office of Administration for approval.

104. "Administrative Directive 95" was not a published agency regulation or otherwise made available to the general public.

105. The permits for the upgrading of the West and Central Plants, which was Project No. 420486, were executed and issued by Counterclaim Defendant Roller on behalf of DER. (Exhibits D–114, D–115).

106. If any agreement was entered into by Mr. Roller on November 17 or 20, 1972, it was not approved by the Comptroller of Pennsylvania. (U)

107. If any agreement was entered into by Mr. Roller on November 17 or 20, 1972, it was not approved by any Commonwealth attorney. (U)

108. If any agreement was entered into by Mr. Roller on November 17 or 20, 1972, it was not approved by the Pennsylvania Office of Administration, Bureau of Systems Analysis. (U)

109. Any agreement entered into by Mr. Roller on November 17 and 20, 1972, did not have approval by the Bureau of Systems Analysis.

110. The DER did all that Mark Roller told L. Vernon Frye it would do by forwarding the applications of the WSA and other municipalities to the U.S. EPA.

111. By letter dated November 20, 1972, from Walter A. Lyon to Edward Furia, Regional Administrator, U.S. EPA, Pennsylvania itself applied for § 206(a) money. (Exhibit P–12) (U)

112. Because the DER itself applied, there were in effect two competing applications for § 206(a) money for Project No. 420486, that of the DER and that of the WSA.

113. By letter dated September 4, 1973, Marshall Cashman, Chief, Program Services Section, Bureau of Water Quality Management, DER, advised the WSA that "Your sewerage construction project WPC–Pa.–486 meets the requirements for reimbursement funding under § 206(a) of the Federal Water Pollution Control Act Amendments of 1972, Public Law 92–500." Mr. Cashman further advised the WSA that "we are currently processing your letter request for submission to the Regional Administrator by the October 18, 1973 filing date set forth in the Federal Register, Volume 38, No. 122, dated June 26, 1973." (Exhibit P–11) (U)

114. Mr. Cashman's letter of September 4, 1973, contained no language evidencing an agreement by DER to forego any § 206(a) money for which DER itself might be eligible.

115. Mr. Cashman's letter of September 4, 1973, was not approved by the Comptroller of Pennsylvania. (U)

116. Mr. Cashman's letter of September 4, 1973, was not approved by any Commonwealth attorney. (U)

117. Mr. Cashman's letter of September 4, 1973, was not approved by the Pennsylvania Office of Administration, Bureau of Systems Analysis. (U)

118. On or about April 16, 1974, the U.S. EPA approved Project No. 420486 for a grant under § 206(a) in the amount of $220,700.00. (U)

119. Of the $220,700.00 referenced in the last preceding paragraph, $198,600.00 was paid by the U.S. EPA to the DER. (U)

120. The $198,600.00 for Project No. 420486 was paid to and received by the DER on July 10, 1974, along with grant payments based on other projects in one lump sum of $8,948,099.00. (U)

121. The $198,600.00 payment made to the DER represented approximately one–half of the § 206(a) grant for which Project No. 420486 was approved as eligible, the balance not being awarded at that time because of insufficient congressional appropriation. As a result of the insufficient congressional appropriation, the U.S. EPA determined to make grants in the amount of approximately 50% of the eligibility of each of the projects at that time. (U)

122. The WSA was not advised prior to April 1974 that DER was claiming or would claim that DER was entitled to receive payment of the § 206(a) grant for the WSA's Project No. 420486. (U)

123. The DER first advised the WSA that DER considered the grant to be subject to reimbursement or pre–financing under § 206(a), or in any other sense, on April 20, 1974. (U)

124. The first time that the WSA was advised that the § 206(a) grant for Project No. 420486 would be paid to the DER was by the April 23, 1974 letter of Fred Grant of the U.S. EPA sent with the Notice of Reimbursement Action. (U)

125. On the "Multipurpose Wastewater Treatment Reimbursement Action" form used by the U.S. EPA for its grant action with respect to § 206(a) payment for Project No. 420486, Plaintiff's Exhibit 4, the "Williamsport Sanitary Authority" appears in the block entitled "grantee."

126. The "Multipurpose Wastewater Treatment Reimbursement Action" form further contains the following condition: "In accepting this award of amendment and any payment made pursuant thereto, (1) the undersigned represents that he is duly authorized to act on behalf of the grantee organization . . . ." (U)

127. The block designated for signature on behalf of the grantee organization on the "Multipurpose Wastewater Treatment Reimbursement Action" form contains the inscription "n/a". (U)

128. A cover letter dated April 23, 1974 (Plaintiff's Exhibit 5), was attached to the "Multipurpose Wastewater Treatment Reimbursement Action" form. It stated, *inter alia*, "Our records indicate the Commonwealth of Pennsylvania prefinanced a portion of the Federal grant to assure a grant at the applicable percentage level, therefore, reimbursement will be made directly to the Commonwealth." (U)

129. The cover letter and "Multipurpose Wastewater Treatment Reimbursement Action" form were received by the WSA on April 25, 1974. (U)

130. The DER accepted the $198,600.00 received for Project No. 420486 as grantee.

131. The DER did not accept the $198,-600.00 for Project No. 420486 on behalf of the WSA.

132. The WSA never authorized DER to accept any payment of any funds or any grant moneys on its behalf. (U)

133. The WSA never acquiesced in the payment of the $198,600.00 of § 206(a) grant for its Project No. 420486 to DER.

134. The U.S. EPA did not designate the DER to receive the $198,600.00 for Project No. 420486 on behalf of the WSA.

135. The WSA waited more than five years after receiving notice that the § 206(a) funds were paid to the DER before asserting claims against DER in any legal action for the funds.

136. The WSA never filed an administrative appeal under 40 C.F.R. § 35.895 demanding payment to it of § 206(a) funds received by the DER.

137. The WSA's first legal action against the DER for the § 206(a) funds was the counterclaim filed in this action on June 6, 1979.

138. The cover letter of April 23, 1974 advised the WSA that if it had any questions or inquiries concerning this matter, it should contact a Mr. E. D. Knott, Pennsylvania Team Leader, Grant Operations Staff, Office of Grants Coordination, of the U.S. EPA. (U)

139. On April 30, 1974, L. Vernon Frye telephoned Mr. Knott and spoke to Mr. Knott concerning the payment of § 206(a) grants to the DER. (U)

140. Mr. Knott advised Mr. Frye to call Marshall Cashman of DER if he questioned the payment of the funds to DER.

141. In his telephone conversation with Mr. Knott, Mr. Frye protested the payment of the § 206(a) grant to DER.

142. Mr. Knott did not tell Mr. Frye of any other procedure or avenue for appealing the payment of the § 206(a) grant to DER.

143. Also on April 30, 1974, L. Vernon Frye telephoned Marshall Cashman, Chief, Program and Board Services Section, Bureau of Sanitary Engineering, DER, to inquire into the payment of the § 206(a) grant to the DER. (U)

144. Mr. Frye was unable to speak to Mr. Cashman and was referred to Mrs. Gertrude Bryson with whom he spoke concerning the payment of the § 206(a) grant to the DER. (U)

145. Mrs. Bryson advised Mr. Frye that DER was claiming the § 206(a) grant for Project No. 420486 because the State Land and Water Conservation and Reclamation Act grant was considered to be pre–financing for the federal funding for WSA's construction Project No. 420486 and that the state grant was subject to reimbursement.

146. In his conversation with Mrs. Bryson, Mr. Frye protested DER's claim to and receipt of the § 206(a) grant for the WSA's construction project and asserted WSA's right to receive the grant payment.

147. Between April 30, 1974 and December 17, 1974, Mr. Frye wrote four letters to the DER concerning the WSA's position with respect to its entitlement to the § 206(a) funds. (Exhibits D–18, D–19, D–20, and D–21) (U)

148. DER advised WSA to apply to the federal government, not DER, for payment of the $198,600.00 in § 206(a) grant funds for WSA's construction project to DER. (Exhibit 17)

149. WSA attempted to resolve the dispute concerning the entitlement to the § 206(a) grant funds diligently and in good faith.

150. When the WSA was not able to obtain an amicable resolution of its differences with the government agencies involved informally, the WSA filed a civil action against the then administrator of the U.S. EPA, Russell Train, *Williamsport Sanitary Authority v. Train*, Civil Action No. 75–1377, in the United States District Court for the Middle District of Pennsylvania. (U)

151. Civil Action No. 75–1377 was filed on November 11, 1975 and was assigned to the Honorable R. Dixon Herman of this Court.

152. The WSA sought to recover the entire $441,350.00 § 206(a) grant, including the $198,600.00 paid to DER, for WSA's Project No. 420486 in *Williamsport Sanitary Authority v. Train*, Civil Action No. 75–1377.

153. Judge Herman issued his decision in *Williamsport Sanitary Authority v. Train* on February 6, 1979 published at 464 F.Supp. 768 (M.D.Pa.) (U)

154. The DER learned that the WSA had instituted the *Williamsport Sanitary Authority v. Train, supra,* Civil No. 75–1377, on December 11, 1975, when it received a copy of the complaint filed by the WSA from the U.S. EPA. (U)

155. The DER provided background information to the U.S. EPA in the *Williamsport Sanitary Authority v. Train, supra,* litigation. (Exhibits D–38, D–39) (U)

156. On May 17, 1979, the DER filed a Petition for Declaratory Judgment in the Commonwealth Court of Pennsylvania which upon removal to this Court became this suit.

157. Counsel properly noticed *Williamsport Sanitary Authority v. Train* in the initial papers filed with the Clerk of Court with the removal petition.

158. At the time the DER filed its Petition for Declaratory Judgment in Commonwealth Court, the WSA was considering the possibility of and researching the requirements for a suit against the Commonwealth and appropriate officers, to recover the $198,600.00 paid to the DER. (U)

159. The total amount paid to the DER by the U.S. EPA under § 206(a) was $9,225,883.00. (U)

160. The § 206(a) payments were received by the DER in the following amounts on the following dates: $8,948,099.00 received July 10, 1974; $21,900.00 received September 7, 1974; $2,430.00 received January 14, 1975; $8,400.00 received January 16, 1975; $39,770.00 received April 21, 1975; $45,614.00 received October 3, 1975; and $159,670.00 received February 10, 1976. (U)

161. The DER believed it was entitled to § 206(a) funds when it applied for, received, and made disposition of the funds.

162. Project No. 420486 was one of 132 sewerage projects for which the DER received grant payments under § 206(a).

163. Pursuant to Act 443, the DER made grants to municipal authorities and municipalities for those 132 projects in the amount of $35,799,160.00. (U)

164. The total amount paid by the U.S. EPA to municipal authorities and municipalities for the 132 projects for which the DER received some payment under § 206(a) to date totalled $30,636,113.00. (U)

165. Section 206(a) grants for approximately 98 other projects in the Commonwealth of Pennsylvania were paid directly to a municipal authority or municipal corporation. (U)

166. Payments were made by the U.S. EPA to either the DER or municipalities based on the U.S. EPA's determination as to whether the DER or a municipality was eligible to receive the funding.

167. The DER did not serve as an agent for disbursing § 206(a) money when the U.S. EPA determined that money should be paid to a municipality.

168. When the U.S. EPA determined that a municipality was eligible to receive the § 206(a) payment, such payment was made directly to the municipality by the U.S. EPA.

169. The U.S. EPA and the DER did not enter any agency agreement for administration of the § 206(a) grant program.

170. The DER did not serve as the U.S. EPA's agent in awarding § 206(a) grants.

171. The § 206(a) grants claimed and received by the DER were used to augment the state grant program under Act 443 which benefitted municipalities and municipal authorities.

172. Project No. 420486 is not eligible for payment of additional state funds under Act 443 and the regulations promulgated thereunder at 25 Pa.Code Chapter 103.

173. All checks received by the DER, including checks received for § 206(a) grants, were and are forwarded to the State Treasury Department (Treasury) through the DER's comptroller and the State Department of Revenue.

174. Treasury also receives other checks and monies, including but not limited to tax revenues, proceeds from sales of bonds and fees.

175. Treasury conveys the checks and monies it receives to a bank and the bank credits the amount received to Treasury's bank account.

176. The amounts credited to Treasury's bank account are invested as soon as possible or paid out as necessary.

177. The amounts credited to Treasury's bank account are not credited to any particular source or purpose. (U)

178. The DER itself does not hold any monies from which it can make payments to grantees or vendors.

179. Payments of state grants awarded by the DER are made by means of checks issued by Treasury.

180. To make payments, the DER must forward a requisition to Treasury through DER's comptroller. The approval of the comptroller and the Treasury is required.

181. "Fund 39" is a term used to identify funds credited to the Land and Water Development Fund by the DER and certain other executive agencies. (U)

182. The Land and Water Development Fund was created as a result of the passage of Act 443.

183. The Land and Water Development Fund includes monies received from the sale of bonds and notes, pursuant to Act 443, and federal funds from several sources including all § 206(a) funds.

184. Monies received by the DER under § 206(a) were credited to Restricted Revenue Account 92. (U)

185. Restricted Revenue Account 92 was created in 1971 by administrative action of DER.

186. Restricted Revenue Account 92 is designated Appropriation Symbol 92 by DER's Comptroller and by Pennsylvania's accounting system.

187. A restricted revenue account is an account code which functions as a discrete revenue identifier. The purpose of an account code is to enable the state to identify and restrict the revenue credited to an account. "Restricted Revenue Account 92" is used by the DER for certain federal grants paid to the DER, including § 206(a) grant funds. (U)

188. The characteristics of a restricted revenue account include the following: a restricted revenue account does not require legislative action for its creation; once a restricted revenue account is created, the account continues from year to year without any further action by the governor or the legislature; money credited to a re-

stricted revenue account is restricted in the purposes for which it can be spent and is restricted in the sources of revenue which can be credited to it.

189. A restricted revenue account is not a bank account. (U)

190. The only funds credited to Restricted Revenue Account 92 are federal grant funds, specifically, funds received under §§ 205(g), 206 and 208 of the Federal Water Pollution Control Act.

191. There is no physical entity known as Fund 39.

192. There is no physical entity known as Restricted Revenue Account 92.

193. Fund 39 and Restricted Revenue Account 92 are names of ledger accounts.

194. The Department of Environmental Resources keeps separate records for all payments credited to and disbursements from Restricted Revenue Account 92.

195. The Office of the Comptroller of DER prepares separate reports for Restricted Revenue Account 92.

196. DER can deduce the ultimate disbursement and expenditure of § 206(a) funds. (U)

197. Restricted Revenue Account 92 is a division of Fund 39. Restricted Revenue Account 92 is separately administered from the rest of Fund 39 by DER in that the funds credited to Restricted Revenue Account 92 are restricted to federal grants, the use to which the restricted revenue funds are to be put is restricted, separate personnel in DER are responsible for the administration of Restricted Revenue Account 92, and separate reports are prepared for Restricted Revenue Account 92 to distinguish funds credited to Restricted Revenue Account 92 from other funds credited to Fund 39.

198. The receipt of federal funds from several sources, including § 206(a), was recorded by the DER under Restricted Revenue Account 92.

199. The § 206(a) funds received by the DER were commingled with other state and federal funds.

200. In its accounting, Treasury concerns itself only with Fund 39 as a whole, not with Restricted Revenue Account 92 or any other part of Fund 39.

201. The individual Counterclaim Defendants do not have physical possession of the § 206(a) grant funds. (U)

202. The individual Counterclaim Defendants did not acquire the § 206(a) funds through execution process. (U)

203. The individual Counterclaim Defendants did not acquire the § 206(a) funds through replevin or any other judicial process similar to execution process.

204. DER can determine the balance of § 206(a) funds carried in Restricted Revenue Account 92 at any time and has determined the balance of the section 206(a) funds in Restricted Revenue Account 92 for purposes of this suit.

205. There is a balance of $3,170,075 of section 206(a) grant funds in Restricted Revenue Account 92 at this time.

206. The DER encumbered $6,055,808.00 of the § 206(a) money it received as grant payments to municipalities and municipal authorities as follows on the indicated dates. (U)

| Amount of Encumbrance | Project | Date of Encumbrance |
|---|---|---|
| $ 20,180.00 | State Grant to Loysville Village Mun. Auth. | 9–10–75 |
| 4,708,778.00 | State Grant to Valley Forge Sewer Auth. | 9–16–75 |
| 605,280.00 | State Grant to Boro of Ambridge Mun. Auth. | 12–4–74 |
| 721,570.00 | State Grant to Boro of Jefferson. | 5–20–76 |

207. The DER expended $5,419,040.00 of the money identified as encumbered in the preceding paragraph on the following dates as indicated below: (U)

| Project | Date of payment | Amount |
|---|---|---|
| Borough of Ambridge Municipal Authority Beaver Co., Pa. | 7–30–76 | $ 52,080.00 |
| | 1–12–77 | 175,470.00 |
| | 5–25–77 | 143,570.00 |
| | 11–25–77 | 159,520.00 |
| | 3–12–79 | 74,640.00 |

| Project | Date of payment | Amount |
|---|---|---|
| Borough of Jefferson | 1-12-77 | 300,740.00 |
| Allegheny Co., Pa. | 3-77-77 (sic) | 116,900.00 |
| | 4-21-77 | 175,340.00 |
| | 1-16-78 | 11,690.00 |
| Loysville Village | 12-16-76 | 3,710.00 |
| Municipal Authority | 3-8-77 | 4,700.00 |
| Perry County, Pa. | 8-26-77 | 4,710.00 |
| Valley Forge Sewer | 11-19-75 | 109,850.00 |
| Authority | 12-30-75 | 239,500.00 |
| Chester Co., Pa. | 3-10-76 | 383,270.00 |
| | 4-23-76 | 383,240.00 |
| | 6-23-76 | 335,340.00 |
| | 9-22-76 | 1,006,000.00 |
| | 10-21-76 | 479,070.00 |
| | 1-27-77 | 689,330.00 |
| | 3-31-77 | 427,780.00 |
| | 10-18-77 | 142,590.00 |

208. The municipalities and municipal authorities identified in the preceding two paragraphs were not eligible for § 206(a) grant payments. (U)

209. $5,334,238 of the encumbrances occurred before filing of the WSA's complaint against the U.S. EPA in *Williamsport Sanitary Authority v. Train*, Civil No. 75–1377 on November 11, 1975.

210. All of the encumbrances occurred before entry of Judge Herman's decision in *Williamsport Sanitary Authority v. Train*, 465 F.Supp. 786 (M.D.Pa.1979).

211. The DER anticipated distributing the remaining $3,170,075.00 calculated balance of § 206(a) funds pursuant to Act 443 as grants to municipalities and municipal authorities for planning, design, and construction of sewerage facilities.

212. The $3,170,075 balance of § 206(a) monies has been placed under a miscellaneous encumbrance which will isolate and hold the balance until this Court declares the rights of the parties to the remaining monies in the instant proceedings.

213. A miscellaneous encumbrance is a device which ties up the Restricted Revenue Account 92 funds so that an amount of money equal to the amount of the encumbrance is held by the Treasury.

214. Granting the relief requested by the WSA would disrupt the DER's program plans and budgeting.

215. Granting the relief requested by the WSA would result in less money being available to the DER for new sewage treatment plants needed to abate pollution of the waters of the Commonwealth.

216. If the WSA had filed its claims in court between April 25, 1974 and July 10, 1974, it would have minimized the disruption of the Commonwealth's programs and budget if the WSA had won.

### III. Discussion.

The Court will first address DER's claim for declaratory relief, then, to the extent that the issues have not been disposed of in the course of that discussion, will turn to the Sanitary Authority's claims for declaratory relief and ultimately will discuss the Authority's claims for damages and mandatory injunctive relief.

DER seeks a judgment declaring that it was the rightful recipient of the § 206(a) funds and is entitled to retain them. The Court has subject matter jurisdiction over this claim because DER's rights to the monies may depend upon a construction of federal law. To the extent DER's claims are based on state law, those claims are pendent to the federal claim and are also within the subject matter jurisdiction of the Court.

In pertinent part, § 206(a) of the 1972 amendments to the Water Pollution Control Act provides:

Any publicly owned treatment works in a state on which construction was initiated after June 30, 1966, but before July 1, 1972, [which meet certain requirements] shall be reimbursed in a total amount equal to the difference between the amount of Federal financial assistance, if any, received under section [1158] [§ 8 of the Water Pollution Control Act, P.L. 84–660,] for such project and . . . 55 per centum of the project cost . . . .

In *Williamsport Sanitary Authority v. Train*, 464 F.Supp. 768 (M.D.Pa.1979), an earlier and closely related case by the Au-

thority and involving a claim against EPA for the same monies, the Honorable R. Dixon Herman of this Court held that § 206(a) is clear on its face and required the EPA to remit the § 206(a) monies to the Sanitary Authority.[1] Judge Herman, however, limited the effect of his ruling to funds still in the possession of the EPA. He did not, therefore, decide who is entitled to approximately $198,000.00 that the EPA had previously paid to DER.

As the Court's opinion accompanying its order No. 1 of June 11, 1980 in this case states, § 206(a) on its face required the funds in question to be paid to the Williamsport Sanitary Authority. While read literally, the section of the amendment requires payments to the treatment works themselves, common sense dictates that the reimbursement be made to the owners of the treatment works, in this case, the Williamsport Sanitary Authority. The reference in § 206(a) to § 8 of the Water Pollution Control Act, 33 U.S.C. § 1158, is a further indication that Congress intended the § 206(a) reimbursement to go to the Authority. Section 8(a) provided for grants to any state, municipality, or intermunicipal agency for the construction of treatment works. In this case, it is undisputed that the § 8 grant went to the Williamsport Sanitary Authority. Therefore, the Sanitary Authority was the entity to be reimbursed a total equal to the difference between what it received under § 8 and 55% of the eligible costs of the project.

Moreover, § 206(b), 32 U.S.C. § 1286(b), specifically provides for reimbursements for state or local funds used in construction of sewer works. That section, however, relates to reimbursement when projects eligible for federal assistance under § 8 did not receive that assistance because of Congress's failure to appropriate necessary funds. Section 206(b) provides reimbursement to the entity, be it the state or local authority, which in fact advanced the federal share of the construction. In this case, it is undisputed that Williamsport Sanitary

Authority received the full amount of § 8 funding to which it was entitled prior to the enactment of § 206. Therefore, DER's argument that it pre–financed the § 8 grant is without merit and does not justify its receipt of the § 206(a) funds in dispute.

The Court's opinion accompanying its order No. 1 of June 11, 1980 examined the Committee reports relating to the 1972 amendments and concluded that the Congress intended 206(a) funds to go to local authorities which because of their states' failure to enact certain pollution standards or to provide required matching funds were not eligible for the maximum funding under § 8 while 206(b) money was to go to whichever entity in fact paid what would have been the federal share under § 8 but was not paid by the federal government because of Congress's failure to make appropriations for that purpose. Section 206(a), therefore, operated to bring federal funding for all eligible projects to 55% regardless of the area of the state in which the plant was located. *Commonwealth of Pennsylvania v. Williamsport Sanitary Authority*, Civil No. 79–690, slip op. at 30–34 (M.D.Pa. June 11, 1980).

■ The parties have submitted portions of the Congressional Record relating to the 1972 amendments. The Court has reviewed the materials submitted by the parties and finds the statements by members of Congress to be inconclusive as to the issue presented in this case. The Court, therefore, relying on the language of § 206(a), its relationship to § 206(b), and the legislative history set forth in [1972] U.S.Code Cong. & Admin.News, p. 3668 concludes that the payment of the $198,600.00 by the EPA to DER was contrary to § 206(a) and that the money should have been paid to the Williamsport Sanitary Authority.

■ The Commonwealth argues that even if the Authority was entitled to the § 206(a) funds, the Authority's acceptance of grants under Acts 443 and 339 permitted the Commonwealth to receive the § 206(a)

---

1. This case should have been assigned by the Clerk's Office to Judge Herman because it is closely intertwined with *WSA v. Train*, previously assigned to and disposed of by him.

monies as a form of reimbursement. The Court's opinion accompanying its order No. 1 of June 11, 1980 held that the absence of any language in the grant applications precluding reimbursement was not dispositive. *Commonwealth of Pennsylvania v. Williamsport Sanitary Authority*, Civil No. 79–690, slip op. at 36–37 (M.D.Pa. June 11, 1980). As the findings of fact indicate, the grants awarded by DER do not contain any reference to pre–financing or otherwise impose an obligation on the Authority to forego any federal funds which might later become available. Title 32 P.S. § 5119, which permits the DER to use available federal funds to augment its grants under Act 443, does not constitute a provision for reimbursement. That section merely provides that if DER is entitled to federal funds, those funds may be used to augment grants under Act 443. Based on the testimony adduced at trial, the Court concludes that when DER awarded the grants under Acts 443 and 339 it did not intend to seek reimbursement from the Sanitary Authority's share of future federal funds which might become available. Moreover, the Williamsport Sanitary Authority never had an intention to forego any federal grant or reimburse the state for any of the latter's grants. Therefore, even if the DER intended to seek reimbursement in that manner, the absence of a meeting ·of the minds on this point precludes any claim for reimbursement based on the grants under Acts 443 and 339.

■ DER has argued that the Authority is not entitled to the § 206(a) funds in dispute because DER sought to assure through Acts 339 and 443 that in any fiscal year all local authorities receiving funds for sewage plant construction received the same combined share of federal and state funds. To accomplish this goal those authorities eligible for more federal funds received less in state grants. DER contends that the Authority would enjoy a windfall if it were to receive the § 206(a) funds and thereby have its share of federal and state funding increased over that of other authorities which commenced projects in 1971.

This argument must be rejected. The federal program under § 206(a) required that the federal share for the Authority's project be 55%. The state's laudable intent to equalize funding must give way to the federal law. The Supremacy Clause of the Constitution prevents Pennsylvania from defeating the federal mandate of 55% federal funding by wrongfully receiving and retaining the § 206(a) funds in dispute.

Having determined that the Williamsport Sanitary Authority should have been paid the § 206(a) money in dispute, the question remains whether the Sanitary Authority was entitled to the money as of June 6, 1979, the date its counterclaims were filed. In response to the Sanitary Authority's counterclaims, DER has raised defenses in addition to the Eleventh Amendment. The Court will first consider the other defenses before addressing the Eleventh Amendment issue. In this way, the claims may possibly be disposed of on a non–constitutional basis which is a preferred method of adjudication. The Court will do this even though the Eleventh Amendment goes to the jurisdiction of the Court and ordinarily a jurisdictional issue should be considered first. The Court will postpone discussion of the Eleventh Amendment issue in this case because the Commonwealth as Plaintiff in the declaratory judgment action sought to establish its rights under both federal and state law. If the Sanitary Authority is barred for other reasons from claiming the § 206(a) funds, there would be no need to address the Court's jurisdiction to award relief on the Authority's counterclaims.

■ In its attempt to prove that the Sanitary Authority has no claim for the § 206(a) money paid to DER, DER offered evidence relating to an alleged contract between DER and the Authority which the Authority claims arose as the result of a telephone conversation between counterclaim Defendant Roller and Vernon Frye, the General Manager of the Authority. The parties have addressed in depth the question whether the appropriate statute of limitations is six years for a written contract as provided in 42 Pa.C.S.A. § 5527(2),

four years for an express oral contract under 42 Pa.C.S.A. § 5525(3), as extended to June 27, 1979 by Act of July 9, 1976, P.L. 586, No. 142 § 2, Appendix Title 42, 6 months for contract claims against the Commonwealth under 72 P.S. § 4651–6, or two years for the recovery of property in the possession of any Commonwealth officer pursuant to 42 Pa.C.S.A. § 5524(6). The Court in its opinion accompanying order No. 1 of June 11, 1980 indicated that the two–year limitation of § 5524(6) is not applicable because that section relates to funds in the possession of a government officer or entity by reason of execution or similar process. The parties were directed to submit the legislative history of that section but neither located any. Consequently, the Court shall make final its determination that § 5524(6) is inapplicable because the funds in question were not in the possession of the counterclaim defendants by reason of execution or similar process.

█ The Court need not resolve the dispute over which statute of limitations is applicable. Based on the testimony at trial, the Court concludes that there was no evidence whatsoever of any contract between DER or any of the counterclaim Defendants on the one hand and the Authority on the other obligating DER to pay the § 206(a) funds to the Authority.

In both the telephone conversation between Roller and Frye and Roller's letter confirming that conversation, DER did not offer to pay any money to the Authority. DER advised the Authority of the availability of funds under § 206(a) and urged the Authority promptly to apply for funds to which it might be entitled. DER offered to assist the Authority, which it did, by forwarding the application to EPA and by providing the required back–up information. Neither Roller nor Frye at the time of the telephone conversation or letter believed that DER was obligating itself to pay any § 206(a) money to the Authority. Moreover, Roller did not have the authority to make such an agreement. Consequently, the Authority's claim for the § 206(a) funds does not rest on any contract theory be it express, implied in fact, or implied in law.

█ After hearing all of the evidence in the case and reviewing the undisputed facts, the Court concludes that the Sanitary Authority's claim for the § 206(a) funds is, as it suggest in its trial brief, a claim for the taking of personal property or for money had and received. Federal law, § 206(a), established the Authority's right to the funds. DER, therefore, wrongfully received the money and the Authority has a valid claim against DER in the nature of conversion. That claim was governed by the six–year statute of limitations, Act of March 27, 1713, 1 Sm.L. 76, *codified at* 12 P.S. § 31 repealed by Act of April 28, 1978, P.L. 202, No. 53, § 2(a), and could have been brought within six years of the date the claim arose which was July 12, 1974, the day DER received the § 206(a) money. The applicable statute of limitations under Title 42 of the Pennsylvania Consolidated Statutes is either the two–year limitation at 42 Pa.C.S.A. § 5524(3) relating to an action for taking personal property, including claims for specific recovery, or the six–year limitation at 42 Pa.C.S.A. § 5527(6) for any civil action which is not subject to another limitation period specified in Title 42. In either event, § 2 of the Appendix, Act of July 9, 1976, P.L. 586, No. 142, gave the Authority one year from June 27, 1978, the effective date of Title 42, in which to assert its claims. Therefore, at the time the Commonwealth filed its petition for declaratory judgment and at the time the Authority asserted its counterclaims, the Authority's claim for the money was not time barred. Since the Court has concluded that the Authority should have been paid the § 206(a) money and since its claim for the money was not time barred, the Court cannot enter the declaratory judgment sought by the Commonwealth but rather must enter a judgment declaring the Authority's right to the section 206(a) money unless such a declaration is barred by the Eleventh Amendment.

Although the Court has determined that the Sanitary Authority has a theory under state law which if not barred by the Elev-

enth Amendment would provide it with full relief, in view of the extensive briefing done on the question of federal claims for relief, the Court will address those issues as well.

■ DER argues that assuming that the Authority has a claim under Federal law, it is barred because the Authority did not pursue the administrative remedy provided at 40 C.F.R. § 35.895 which, if applicable, requires an administrative appeal within 30 days of the date of a Regional Administrator's order. The Court concluded in its opinion accompanying order No. 1 of June 11, 1980 that on the basis of the record then before it 40 C.F.R. § 35.895 was not applicable to this case. *Commonwealth of Pennsylvania v. Williamsport Sanitary Authority*, Civil No. 79–690, slip op. at 9–11 (M.D.Pa. June 11, 1980). After hearing testimony on the issue and considering the additional briefing of the parties, the Court adheres to that conclusion.

Title 40 C.F.R. § 35.895 governs administrative appeals when there is a question as to the eligibility of an applicant for federal financial assistance, the amount to which it is entitled, or the allowability of costs. In this case, there is no dispute that the Williamsport Sanitary Authority was eligible to receive funds under § 206(a) in the sense that its project had not received 55% federal funding under § 8. In addition, there is no dispute as to the amount to be awarded for the Sanitary Authority's project. Neither is there any dispute as to the allowability of costs. What is in dispute is to whom the money was to have been paid. The EPA determined that although the Authority was eligible for the monies in question, that money would be paid to the state because the EPA concluded that the state had "prefinanced" a portion of federal share.

While it is possible to stretch the language of § 35.895 to cover this case, it is the Court's view that the EPA did not intend its regulation to be so construed. This is evidenced by the fact that in notifying the Authority that its money would be paid to DER, EPA did not inform the Authority of its rights under 40 C.F.R. § 35.895. Rather,

EPA instructed the Authority to contact one of its own employees if the Authority had any questions. If EPA, which promulgated the regulation considered it applicable, it would probably have brought the regulation to the Authority's attention when it announced its intention to pay the money to DER. Moreover, 40 C.F.R. § 35.-895 relates to disputes with the EPA. It was not promulgated to limit the rights of unsuccessful applicants to sue parties other than EPA if such suits are otherwise permitted. The Authority's claim, therefore, is not barred because of its failure to exhaust administrative remedies.

■ Turning now to a determination of the parties' respective rights under federal law, the Court must first determine whether to imply a cause of action in favor of the Authority under § 206(a). The Authority argues that no cause of action for damages can be implied from § 206(a) but contends that equitable relief is available. "The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction." *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979).

■ In *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), the Supreme Court set forth four relevant factors to consider in determining whether to imply a private cause of action from a federal statute. First, whether the plaintiff is one of a class for whose special benefit the statute was enacted; second, any indication of legislative intent; third, consistency with the underlying purposes of the legislation; and fourth, whether the cause of action is one traditionally relegated to state law so that it would be inappropriate to infer a cause of action based solely on federal law. In *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76, 99 S.Ct. 2479, 2488–89, 61 L.Ed.2d 82 (1979), the Supreme Court, in explaining *Cort v. Ash*, stated that the four factors are not entitled to equal weight. The central inquiry is whether Congress intended to create a private cause of action. *See Micklus v. Carl-*

*son,* 632 F.2d 227, 235 (3d Cir. 1980).

Turning first to the statutory language, § 206(a) states only who is entitled to reimbursement. To that extent, it was passed for the special benefit of a class a member of which is the Authority. The facts that § 206(a) was designed to benefit the Authority and that it has been harmed by a violation of § 206(a) do not require the implication of a private action on its behalf. *See Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). Section 206 does not in any way impose liability on anyone or address the responsibilities of anyone other than the Administrator of the Environmental Protection Agency.

Turning to the second factor identified in *Cort,* the legislative history accompanying § 206 yields no information concerning the possibility of private rights of action against entities who improperly received § 206(a) funds.

Looking at other sections of the Water Pollution Control Act to determine if a private cause of action is consistent with the underlying purposes of the statute, 33 U.S.C. § 1365(a)(2) provides for a civil action against the administrator of the EPA where "there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." This section shows that Congress contemplated a cause of action against the Administrator in certain circumstances. Section 206 imposes a non–discretionary duty upon the Administrator to reimburse eligible applicants. Had the Authority taken advantage of the right of action provided in § 1365 before the EPA paid the money to the state, the Authority would not be in the position it is now; *attempting to recover the money from DER.*

"[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.'" *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 19–20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979) (citation omitted). Congress provided for a judicial remedy to prevent the particular harm suffered by the Authority. While admittedly the Authority did not have an abundance of time in which to pursue its remedy, it did have from April 1974, when it learned that EPA was going to pay DER, until July 1974, when the first payment was made to DER, to commence an action against the EPA to prevent payment of the funds to DER. Although EPA and DER told the Authority that it should petition the other for redress, neither did anything which prevented in any way an action by the Authority against the Administrator as contemplated by 33 U.S.C. § 1365(a)(2). "In view of [the] express [provision] for enforcing the duties imposed by [§ 206], it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.'" *Transamerica Mortgage Advisors v. Lewis,* 444 U.S. at 20, 100 S.Ct. at 247 (citation omitted). Therefore, the Court concludes that a private cause of action against the recipient of § 206(a) funds is not consistent with the purposes of the Water Pollution Control Act which limited private actions to those against the Administrator.

Moreover, the recovery of money wrongfully paid has traditionally been a concern of state law. A claim for conversion or for money had and received provides a plaintiff with an adequate remedy. There is, therefore, no reason to assume Congress intended to create a duplicative federal cause of action.

Looking at the four factors delineated in *Cort* and heeding the Supreme Court's admonishment that a private cause of action is to be implied only if Congress so intended, the Court concludes that Congress did not intend to create a private cause of action in favor of the Authority against DER.

The Authority argues that even though it has no right of action for damages under § 206(a), the Court may imply an equitable claim. The Authority argues that a different analysis is to be used when equitable claims are asserted. The Court must reject this argument in light of the Supreme Court's decision in *Transmerica Mortgage Advisors.* In that case, the Court considered whether §§ 206 and 215 of the Investment Advisors Act of 1940 created implied legal or equitable causes of action. After a review of the statutory language and legislative history, the Court concluded that § 215, which declared certain contracts void, implied a private cause of action for rescission of such contracts or to enjoin their enforcements. *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. at 19, 100 S.Ct. at 247. The Court also determined that no legal or equitable claim could be implied from § 206 which made unlawful certain activities. *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. at 24, 100 S.Ct. at 249. The Court embarked on no different type of analysis in reaching the conclusion with respect to equitable remedies.

The type of injunctive relief sought by the Authority is another reason why a private cause of action in its favor cannot be implied from § 206(a). The equitable remedies sought by the Authority are indistinguishable for all practical purposes from its claims for damages. All seek payment of approximately $198,000.00 representing the amount of the § 206(a) funds paid by EPA to DER. Whether that relief is ordered in the form of damages or in the form of an injunction directing that the money be paid is immaterial. The Court, therefore, need not decide whether a claim for equitable relief seeking to enjoin the DER from accepting future § 206(a) money may be implied from § 206. The Authority cannot by attaching the label of injunctive relief change the nature of is claims which are in essence for damages.

The cases cited by the Authority in support of its argument that the Court may grant it equitable relief are inapposite. Each of those cases involved situations where the plaintiffs' complaints stated a claim for relief under either federal or state law and the question involved was whether the federal court should exercise its equitable powers. That situation is not present here because the Authority does not have a claim for relief under Federal law. Moreover, the equitable relief ordered in each of the cases cited by the Authority enjoined the Defendants from acting contrary to the law in the future. In this case, the only equitable relief sought by the Authority is in the nature of an order directing DER to pay the § 206(a) money. Consequently, the Court concludes that § 206 does not provide the Authority with any equitable claim to recover § 206(a) money from DER. Since the Authority has no equitable claims, the Court need not determine if they are barred by laches.

Having determined that the Sanitary Authority was entitled to the § 206(a) funds and that the money was improperly paid to DER, the Court must now determine what relief it is able to grant the Authority. In its counterclaims, the Authority requests payment of the $198,600.00 under theories of breach of contract, constructive trust, and mandatory injunctive relief. As indicated above, the Authority has no contract claims against DER. The Court must decide whether it may consistently with the Eleventh Amendment award the $198,600.00 to the Authority under any of the remaining theories.

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment has long been extended to prohibit suits against a state by her own citizens. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The Court's opinion of January 21, 1980, held that the Authority's status under Pennsylvania law did not prevent the Defendants

**1194**

from raising the Eleventh Amendment as a bar to the Court's jurisdiction.

■ The Eleventh Amendment bars an action by a private party seeking to impose a liability which must be paid from public funds in the state treasury. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). It matters not what label is attached to the award. If the award must inevitably come from the general revenues of the Commonwealth it is barred by the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. at 665, 94 S.Ct. at 1356. If, however, the award takes the form of prospective relief, requiring the counterclaim Defendants to conform future conduct to federal law, then the award is not prohibited. *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979).

■ In this case, an award of moneys would be retrospective relief to compensate the Authority for DER's wrongful retention of the § 206 funds. It is undisputed that there will be no future funds appropriated under § 206(a) to which the Authority is entitled. Therefore, the Court cannot issue an injunction requiring DER to pay future awards from the EPA to the Authority. The relief sought by the Authority would compensate it for DER's past conduct which is now determined to have been unlawful. *See Edelman v. Jordan*, 415 U.S. at 668, 94 S.Ct. at 1358.

Even though an award in this case would be in the nature of compensation for past injury, such an award is not prohibited by the Eleventh Amendment unless it would require the payment of state funds. The Authority asserts that since DER keeps separate bookkeeping records showing its expenditure of § 206(a) funds, an award by this Court could be satisfied from federal funds, not state funds. The fallacy of this argument is that it substitutes the illusion of bookkeeping for the reality of what happened to the money EPA paid to Pennsylvania.

The $198,600.00 in dispute in this case was included in a check to Pennsylvania in an amount of approximately $9,000,000.00 which was delivered in July 1974. The check was deposited to the credit of the Commonwealth in a Philadelphia bank. It was carried on the Commonwealth's books in its Fund 39 until it was withdrawn and used to purchase commercial paper. Once the commercial paper matured, the proceeds thereof were again credited to Fund 39 and shortly thereafter disbursed. At no time did Pennsylvania segregate the § 206(a) funds from other revenues. Moreover, the Commonwealth was able to draw checks on the money so long as it remained in its demand deposit account. Any judgment directing payment of an amount in excess of $198,000.00 would be satisfied from funds available to the Commonwealth of Pennsylvania. It is immaterial whether DER would in accounting for that disbursement charge its Appropriation Symbol 92. DER's bookkeeping has no relation to the movement of funds in the Commonwealth's fiscal system. DER's books may show authorization to spend sums of money in excess of the amount of cash available to the Commonwealth. Without cash available, the Treasurer will not issue any checks.

It was also developed at trial that the payment of $198,600.00 would have a direct impact on the fisc of the Commonwealth. Pennsylvania has used the § 206(a) money to supplement funds it has available for the construction of new sewage treatment plants. An award of $198,600.00 to the Authority would upset DER's allocation of those funds. It is this type of disruption the Eleventh Amendment forbids. *See Edelman v. Jordan*, 415 U.S. 651, 666 n.11, 94 S.Ct. at 1357 n.11 (1974).

The Authority makes much of the fact that the § 206(a) money was paid by the federal government rather than collected by the Commonwealth in the form of taxes. This fact, however, is not material. In *Edelman v. Jordan*, the District Court had awarded retroactive benefits to public aid recipients from an Illinois program funded in part by federal funds. There is no discussion in *Edelman* indicating that the initial source of the money used to satisfy the award is relevant. The Supreme Court con-

cluded that any award of retroactive benefits by a federal court is barred by the Eleventh Amendment.

The Authority attempts to limit the reach of *Edelman* by arguing that the only state funds it is concerned with are those derived from state tax revenues. Such a limited reading of *Edelman* is not warranted by the case. At no point does the Court define "state funds" in such a restricted manner. Nor would it be consistent with the reasoning of *Edelman* to have done so. *Edelman* clearly establishes the principle that the power of a federal court does not extend to directing a state to pay a money judgment for past conduct found to be unlawful. Any funds which a state uses to pay such a judgment are state funds for the purposes of the Eleventh Amendment if those funds would otherwise be available to the state to be used as it pleases. The facts in this case indicate that from the moment the check from EPA was received by Pennsylvania it was treated similarly to all other revenue received. The payment of $198,600.00 would of necessity leave the Commonwealth with $198,600.00 less than if the payment were not made. The effect on Pennsylvania would be the same regardless of the label attached to the relief. For Eleventh Amendment purposes, there is no distinction between damages, imposition of a constructive trust or injunctive relief requiring Pennsylvania to pay the Authority $198,600.00. *See Edelman v. Jordan*, 415 U.S. 651, 666, 94 S.Ct. 1347, 1357, 39 L.Ed.2d 662 (1974).

The Court's opinion of January 21, 1980 rejected the Authority's argument that DER waived its Eleventh Amendment protection because it commenced this action in state court or because of its cooperation with EPA in the *Train* action or because of its participation in the federal pollution control program. *Commonwealth of Pennsylvania v. Williamsport Sanitary Authority*, Civil No. 79–690, slip op. at 5–9 (M.D.Pa. January 21, 1980). The Authority was unable to prove that DER acted as EPA's agent in administering the § 206(a) program. The Court, therefore, need not consider what effect, if any, DER's status as EPA's agent would have on DER's right to assert the Eleventh Amendment as a bar to the Authority's claims.

This case is also distinguishable on its facts from the cases of *Schiff v. Williams*, 519 F.2d 257 (5th Cir. 1975), and *Bowen v. Hackett*, 387 F.Supp. 1212 (D.R.I.1975). *Schiff* involved the question whether a judgment against a state university for back pay to the plaintiffs who were wrongfully discharged from their positions as editors of the student paper was barred by the Eleventh Amendment. In that case, the Court of Appeals found that the judgment would be paid from a fund generated by student activities fees which were collected for the purposes of operating the newspaper, including paying the salaries of the editors. In addition, the fund did not come into the possession of the state until after the lawsuit in question was commenced.

*Bowen* involved a claim against two employment security funds mandated by Rhode Island law but administered separately from the state treasury. The funds were at all times segregated from the general revenues and Rhode Island had not pledged its credit to maintain the solvency of the funds.

In the related case of *Municipal Authority of Bloomsburg v. Pennsylvania*, 496 F.Supp. 686, (M.D.Pa. 1980), the Court in denying Pennsylvania's motion to dismiss held that the Plaintiffs' claims would not be barred by the Eleventh Amendment if they could prove that the § 206(a) money was paid with the understanding that it would be distributed to the Plaintiffs and that it was maintained separately from other state funds. The federal government placed no restrictions on the uses recipients could make of the money. It was paid to reimburse them for past expenses. The fact that the money was improperly paid to DER may impose an implied duty on DER to pay the money to the Authority thereby meeting the first branch of the test set forth in *Bloomsburg*. The Authority, however, was not able to meet its burden with respect to the second branch because the

money paid pursuant to § 206 was not maintained separately from other state funds. The fact that an influx of money from the federal government permits Pennsylvania to spend more on its sewage treatment program than it otherwise could have done does not make the additional amount available federal rather than state funds. The Commonwealth at all times has treated the proceeds of the check from EPA as available for meeting the cash needs of the Commonwealth. The fact that DER kept track of its expenditures in a way to show it when it had spent an amount equal to the § 206(a) funds does not alter the fact that at all times the cash was available and used by the Commonwealth for its day to day needs. In short, there is no fund of § 206(a) moneys from which to satisfy a judgment. The Eleventh Amendment, therefore, prevents this Court from ordering the payment of the $198,600.00 to the Authority under any of the theories put forth by the Authority.

DER contends that the Eleventh Amendment also prevents the Court from granting declaratory relief. A judgment declaring the respective rights of the parties will not in and of itself require the Commonwealth to do anything. Like the notice approved in *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), which informed members of the Plaintiff class of available state administrative procedures through which to determine whether they were eligible for past benefits, declaratory judgment in this case would *not* by itself require Pennsylvania to pay any money to the Authority. In order for that to occur, the Authority must first decide to seek payment from Pennsylvania in state court. Next, the state court must determine whether to order payment to the Authority. The federal court plays *no* role in either determination. Whether the Authority will receive its money "rests entirely with the State, its agencies, courts, and legislature, not with the federal court." *Quern v. Jordan*, 440 U.S. 332, 348, 99 S.Ct. 1139, 1149, 59 L.Ed.2d 358 (1979). The Eleventh Amendment, therefore, does not prevent the Court from awarding declaratory relief.

## IV. Conclusions of Law.

1. The Court has subject matter jurisdiction over the claims for declaratory relief.

2. The Court lacks subject matter jurisdiction over the Authority's counterclaims seeking payment of $198,600.00.

3. There was no contract between DER and the Authority for the payment of the § 206(a) funds.

4. There is no private cause of action created by § 206(a) of the 1972 Amendments to the Water Pollution Control Act available to the Authority against DER for payment of the § 206(a) money in dispute.

5. The Authority is entitled to a judgment declaring that it was the proper recipient of $198,600.00 in § 206(a) funds and that DER improperly received and retained those funds.

6. The Authority is entitled to a judgment declaring that neither Act 443 nor Act 339 authorized DER to receive or retain the § 206(a) funds.

7. The Authority's requests for an injunction enjoining violations of the Pennsylvania Land and Water Conservation and Reclamation Act, 32 P.S. §§ 5101 et seq. and Water Pollution Control Act Amendments of 1972, 33 U.S.C. §§ 1251 et seq. will be dismissed because there is no probability of future conduct in violation of those acts.

An appropriate order will be entered.

## JUDGMENT

This action came on for trial before the Court, Honorable Malcolm Muir presiding, and the issues having been duly tried and in accordance with the Order of Court entered this date,

IT IS ORDERED AND ADJUDGED that:

1. The Williamsport Sanitary Authority was the proper recipient of $198,600.00 of funds authorized by § 206(a) of the 1972 Amendments of the Water Pollution Con-

trol Act, 33 U.S.C. § 1286(a) and the Commonwealth of Pennsylvania, Department of Environmental Resources, acted unlawfully in the receipt and retention of that money.

2. Neither the Pennsylvania Land and Water Conservation and Reclamation Act, 32 P.S. §§ 5101 et seq., nor Act 339, 35 P.S. §§ 701 et seq. authorized DER's receipt and retention of the § 206(a) funds.

3. DER's claims for declaratory relief are dismissed.

4. The remaining claims of the Williamsport Sanitary Authority are dismissed.